Chief Judge Fulo.
On this appeal from a judgment in favor of the plaintiff in an action for a breach of contract, two questions were originally briefed and argued—first, whether the defendant is entitled to sovereign immunity and, second, whether the defendant may invoke the “ act of state” doctrine. We ordered reargument, requesting the parties to address themselves to further questions, the primary one being whether the Hickenlooper Amendment to the Federal Foreign Assistance Act of 1961 (hereafter referred to as the Hickenlooper Amendment)[1] covers this case and bars application of the act of state doctrine.
*50 The case stems from a regulation of the Cuban Government — adopted after Fidel Castro’s accession to power in January of 1959—which, in effect, prevented American and other foreign investors from receiving currency other than Cuban pesos on their Cuban investments. The investor here involved was the plaintiff’s assignor, Alexander Bitter, an American citizen, now living in Florida, who resided in Cuba at the time of the events from which this lawsuit arises. In 1957, some two years before the events in question, he invested about $350,000 in a Cuban farm. At that time, the Cuban Government permitted foreign investors to turn the proceeds from their enterprises into American dollars, or other foreign currency, and exempted such proceeds from Cuba’s tax on the exportation of money. To this end, the Currency Stabilization Fund of the Cuban Government was authorized to issue “ certificates of tax exemption.” In June, 1959, six months after the inception of the Castro regime, Bitter acquired eight such certificates, aggregating $150,000.[2]
Each certificate recites that
“Alexander, S. Bitter or a member Bank of the System, as endorsee hereof, will receive from Banco Nacional de Cuba [defendant herein] against delivery to said Bank of $ Cuban Pesos and surrender of this Certificate, a check on New York for an equal amount of United States Dollars, exempt from the Tax on Exportation of Money.
‘ ‘ This Certificate is issued and delivered inasmuch as the importation and investment in Cuba of the said funds have been duly accredited in accordance with the provisions of Law-Decree No. 548 of November 20, 1952 and its Begulations.”
Although the certificates state that their owner “will receive from [defendant bank] ” the appropriate “ amount ” of American dollars, they are signed by both the defendant and the Cuban Government’s Currency Stabilization Fund.
*51 On July 15, 1959, the Currency Stabilization Fund issued “Decision No. 346.” Aimed at stopping the flow of foreign currency from Cuba and thereby preventing a situation “ very dangerous” to that country, the Decision suspended “for the time being processing of ’ ’ tax exemption certificates ‘ ‘ until reorganization of the system of exemptions ”. The redemption of such outstanding certificates, according to the president of defendant bank, would have wiped out Cuba’s dollar reserves. When, in December of 1959, Bitter tendered his certificates for redemption, together with the appropriate number of pesos, payment in American dollars was refused under the mandate of the Decision.
The plaintiff, Bitter’s assignee, brought the present action, late in 1960, in Supreme Court, New York County, and obtained a judgment against defendant bank in the amount of $150,000, with interest.[3] A closely divided Appellate Division affirmed, rejecting the defendant’s claims (1) that it was entitled to sovereign immunity from suit as an agency of the Cuban Government and (2) that the Decision in question “had the force of law ” and was an act of the sovereign Government of Cuba to which our courts will not deny legal effect.
On the first of these questions, that of sovereign immunity, the entire court is in agreement with the Appellate Division, and we dispose of the point very quickly. In view of the State Department’s conclusion (set forth in a note not included in the record) that the activities out of which the present action arose “were of a jure gestionis [commercial] * * * nature ” and its position that immunity should not be granted in such cases, we must decline to accord the defendant sovereign immunity from suit. It is “ not for the courts to allow immunity ’ ’ on grounds ‘ ‘ which the government has not seen fit to recognize.” (Republic of Mexico v. Hoffman, 324 U. S. 30, 35; see, also, National Bank v. Republic of China, 348 U. S. 356, 360; Victory Transp. v. Comisaria General, 336 F. 2d 354, 360, cert. den. 381 U. S. 934.)
This brings us to the second question presented, namely, whether the act of state doctrine bars the plaintiff’s claim.
*52 It has long been settled,[4] and recently reaffirmed by the Supreme Court in Banco Nacional de Cuba v. Sabbatino (376 U. S. 398, 416 et seq.), that the courts in the United States will not inquire into the validity of the acts of a foreign government done within its own territory. As the Supreme Court stated in Underhill v. Hernandez (168 U. S. 250, 252)—quoted in Sabbatino (376 U. S., at p. 416)—“ [e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.”
Our courts will not examine a foreign law to determine whether it was adopted in conformity with the internal procedures and requirements of the enacting state. The act of state doctrine, it has been well said, is not limited to situations in which “the foreign act is committed in a manner ‘ colorably valid ’ under foreign law. It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal. * * * So long as the act is the act of the foreign sovereign, it matters, not how grossly the sovereign has transgressed its own lawsd’ (Banco de Espana v. Federal Reserve Bank, 114 F. 2d 438, 444; emphasis supplied.) The opinion in Sabbatino itself is unequivocal on this point. “The courts below”, the Supreme Court wrote (376 U. S., at p. 415, n. 17), “ properly declined to determine if issuance of the expropriation decree complied with the formal requisites of Cuban law. # * * If no institution of legal authority would refuse to effectuate the decree, its ‘formal’ status—here its argued invalidity if not properly published in the Official Gazette in Cuba—is irrelevant. It has *53 not been seriously contended that the judicial institutions of Cuba would declare the decree invalid.” Nor, it should be noted, does the plaintiff before us make any such claim.
Consequently, there is no basis whatever for the plaintiff’s contention that the action dishonoring and repudiating the certificates held by Ritter was not an ‘ ‘ act of state. ’ ’ Regardless of whether or not Decision No. 346 was published in the Official Gazette or otherwise complied with internal Cuban standards of regularity, it was issued by the Currency Stabilization Fund, an official instrumentality of the Cuban Government. Moreover, in compliance with that Decision — or even if only in purported compliance — Banco Nacional, also an agency of the Cuban Government, refused and continues to refuse to exchange pesos for dollars as the certificates had required. These undisputed facts establish, as matter of law, that the breach of contract, of which the plaintiff complains, resulted from, and, indeed, itself constitutes, an act of state.[5]
On this analysis, there is no issue of burden of proof. Rather, the question is, what need be proved. The defendant introduced evidence showing that Decision No. 346 had been issued by the Currency Stabilization Fund, that it was adopted as a measure to control currency and foreign exchange and that defendant bank had regarded the Decision as binding upon it and as prohibiting performance of the agreement in the tax exemption certificates. The plaintiff adduced evidence to the effect that the Decision did not conform to Cuba’s fundamental law and that it had not been published in the “ Official Gazette.” But that was insufficient, as matter of law, to establish that the action dishonoring and repudiating the certificates was not an act of state. It was incumbent on the plaintiff to prove that the Cuban authorities themselves would deem Decision No. 346' invalid and would disregard it. This she was obviously unable to do.
Since it is thus apparent that there was an act of state, it follows — unless the Hickenlooper Amendment requires the *54 court not to apply the act of state doctrine (infra, pp. 57-62) — that we are barred from all further inquiry in this case concerning Cuba’s action and, in particular, from any inquiry that would test such action by the standards of international law or the public policy of this forum.
In Sabbatino, where the Supreme Court most recently considered the act of state doctrine, it was confronted with a complete and outright expropriation of American property, a quantity of sugar, by Cuba. Nevertheless, taking into consideration the “fluidity of present world conditions ” and the division of opinion upon the “ limitations on a state’s power to expropriate the property of aliens ’ ’, the court was of the opinion that, whether or not an ‘ ‘ international standard in this area” might be discerned, the “matter is not meet for adjudication by domestic tribunals ” (376 U. S., at pp. 428, 429, 434). Accordingly, and having in view the particular facts of the case before it, the Supreme Court said (376 U. S., at p. 428):
‘ ‘ Therefore, rather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.”[6]
Indeed, if the act of state doctrine was decisive in the situation presented in the Sabbatino case, then, it must surely be so here — again, unless the Hickenlooper Amendment requires a different result. In the present case, although there are circumstances which undoubtedly imposed serious losses upon the *55 plaintiff’s assignor, manifestly, they do not reach the level of an outright “taking” or “ expropriation ” with which the court was confronted in Sabbatino.
The Government of Cuba, by its Decision No. 346, has actually done nothing more than enact an exchange control regulation similar to regulations enacted or promulgated by many other countries, including our own. (See, infra, pp. 63-64.) A currency regulation which alters either the value or character of the money to be paid in satisfaction of contracts is not a “ confiscation ” or “ taking.” (Cf. Norman v. B. & O. R. R. Co., 294 U. S. 240, Nortz v. United States, 294 U. S. 317, and Perry v. United States, 294 U. S. 330 [Gold Clause Cases].) As one authoritative writer in the field has stated (Mann, Money in Public International Law, 96 Recueil Des Cours [1959] 1, 90), “ A legislator who reduces rates of interest or renders agreements invalid or incapable of being performed or prohibits exports, or renders performance more expensive by the imposition of taxes or tariffs does not take property. Nor does he take property if he depreciates currency or prohibits payment in foreign currency or abrogates gold clauses. Expectations relating to the continuing intrinsic value of all currency or contractual terms such as the gold clause are, like favorable business conditions and good will, ‘ transient circumstances, subject to changes ’, and suffer from ‘ congenital infirmity ’ that they may be changed by the competent legislator. They are not property, their change is not deprivation.” (See, also, 1 Hyde, International Law Chiefly as Interpreted and Applied by the United States [2d rev. ed., 1945], pp. 690-691.)
In the light of Sabbatino, we must recognize that the currency regulations of a foreign state — at least when presented in a context such as this one — are not appropriate subjects for evaluation by state courts applying local conceptions of public policy. The “ continuing vitality ” of the act of state doctrine, the Supreme Court wrote in Sabbatino (376 U. S., at pp. 427-428), “ depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs.” As Mr. Justice Hablan observed (p. 432), “Piecemeal dispositions” by courts which refuse to accord validity to the acts of a foreign *56 sovereign within its borders ‘ ‘ could seriously interfere with negotiations being carried on by the Executive Branch and might prevent or render less favorable the terms of an agreement that could otherwise be reached.” (See, also, Zschernig v. Miller, 389 U. ,S. 429, rehearing den. 390 U. S. 974.)
In an area of international law where, for instance, there is a wide divergence “ between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system ”, judicial restraint is surely indicated (376 U. S., at p. 430): “It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations.” Even if, therefore, we were to assume that the decision of the Cuban instrumentality here involved was contrary to our public policy, such considerations would not affect our determination. As the Supreme Court observed in the far harsher context of Sabbatino (pp. 436-437), “However offensive to the public policy of this country and its constituent States an expropriation of this kind may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm of its application.”
We might properly conclude at this point. The parties themselves raised no other issues in the courts below or on the original argument of this appeal. However, in deference to the views of some of the members of this court, we directed reargument and, as noted above (p. 49), requested the parties to address themselves, in essence, to the further question whether the Hickenlooper Amendment covers this case and bars the court from applying the act of state doctrine.[7]
*57 In our view, the Hickenlooper Amendment is inapplicable. The statute was enacted to “ reverse in part ” the decision in Sabbatino (S. Rep. No. 1188, Pt. I, 88th Cong., 2d Sess., p. 24 [1964]). So far as relevant, the amendment declares that “ no court in the "United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim, of title or other right to property is asserted by any party including a foreign state * * * based upon (or traced through) a confiscation or other taking * * * by an act of that state in violation of the principles of international law ”. (Emphasis supplied.)[8]
It is plain enough upon the face of the statute — and abundantly clear from its legislative history—that Congress was not attempting to assure a remedy in American courts for every kind of monetary loss resulting from actions, even unjust actions, *58 of foreign governments. The law is restricted, manifestly, to the kind of problem exemplified by the Sabbatino case itself, a claim of title or other right to specific property which had been expropriated abroad. (See Henkin, Act of State Today: Recollections in Tranquility, 6 Colum. J. of Transnatl. L. 175, 185, 186.)
The basic terms of the statute—to come directly to its wording — simply cannot be made to fit the present case. The amendment applies only if there is a “ claim of title or other right to property ” and that claim is “ based upon (or traced through) a confiscation or other taking ’ ’ of such property.[9]
We must thus attempt to identify the “property” — or the proceeds of such property—which was allegedly “ confiscated or taken ” from Ritter by the action of the Cuban Government. It is quite evident that, before the issuance of Decision No. 346, Ritter had only two things that are relevant to this action— *59 (1) some 150,000 pesos or the means of obtaining them and (2) a contract made in Cuba, to be performed in Cuba (by delivery there of a check), and subject, from its inception and at all times since, to the laws of Cuba.[10] He did not, it must be emphasized, have any fund of dollars with which this action is concerned nor did he have rights to any specific fund of dollars in the possession of any other party. What, then, was ‘ ‘ taken ’ ’ 1
Ritter’s loss is due not to a taking of property but, rather, to the breach of a promise upon which he had relied. What had happened— and undoubtedly to Ritter’s financial loss—was that the Cuban law which governed the contract had been changed by the adoption of a government regulation which “ suspended,” perhaps permanently, the conversion of pesos into dollars. In the strictest sense, and within the terms of the statute we are construing, just as no one has “ taken ” the pesos from Ritter, so no one has “ taken ” the contract from him; it is still his or his assignee’s to enforce, or attempt to enforce, as the present action bears witness. No other party claims to be possessed of the contract rights that Ritter had acquired. It is not as though the Cuban Government had assumed title to a contract right or other chose in action that had belonged to Ritter and had then sought to enforce it against the obligor. Indeed, as will shortly appear (infra, p. 61), even if a true, outright confiscation of this kind had occurred — that is, an actual divesting of ownership of a contract right — it would still be outside the compass of the Hickenlooper Amendment.
If there could be any doubt that the amendment is inapplicable to claims for breach of contract, that doubt is dispelled by reference to the legislative history, both of the original enactment in 1964 and the change in wording adopted in 1965.
Throughout the committee hearings and proceedings in Congress, the supporters of the bill and those who commented upon it were quite explicit about the intended purpose of the proposal. That purpose was simply to permit an adjudication “ on the merits ”, despite the holding in Sabbatino, in those cases in which a party asserts “ a claim of title or other right ” to property which has been confiscated or taken and such property *60 becomes the subject of a lawsuit in the United States. Indeed, Senator Hiekenlooper himself expressly declared, at one point, that the purpose of his proposal was to require our American courts to apply international law “ whenever expropriated property comes within the territorial jurisdiction of the United' States ’ ’, noting that, unless his proposal was accepted and the Sabbatino decision overruled, this country might become “ an international ‘ thieves market ’ ” (110 Cong. Rec. 19548).[11]
The words ‘' confiscation ’ ’ and ‘ ‘ taking ’ ’, the debates and committee hearings established, were used synonymously with “ expropriation ” and “ nationalization.” (See, e.g., Hearings Before Senate Committee on Foreign Relations on S. Bill 2659, 2660, 2662, 88th Cong., 2d Sess. [1964], p. 619; S. Rep. No. 1188, Pt. I, 88th Cong., 2d Sess. [1964], p. 24; 110 Cong. Rec. 19548, 19557-19559, 23680, 24076-24077.) Nothing in the lengthy record of the congressional proceedings suggests that the amendment was designed to cover claims of breach of contracts by a foreign government such as the one in this case. Nor was there any intimation that Congress had in view the highly complex problems of exchange control regulations, repudiation of debts or depreciation of currency. Conspicuously absent from the hearings was the kind of expert testimony on international monetary problems which surely would have been sought if the Congress had been addressing itself to problems of that nature.
Further proof of the limited scope intended for the exemption from the act of state doctrine is found in the Senate’s refusal to enact Senator Hiekenlooper’s original, broadly worded, draft of the amendment which would have made the act of state dóc *61 trine inapplicable to any case ‘ ‘ in which an act of a foreign state occurring after January 1,1959 is alleged to be contrary to international law ”.[12] The statute, as actually adopted in 1964, contained the far more restrictive wording which we have already discussed.
In point of fact, to eliminate any possibility that the original language, adopted in 1964, might be construed to cover or encompass ordinary contract rights, or anything other than specific and identifiable and ‘ ‘ traceable ’ ’ property, Congress amended the statute in 1965. In its original form, the amendment referred to cases in which “ a claim of title or other right is asserted * * * based upon (or traced through) a confiscation or other taking.” By the 1965 modification, the words, “ to property ”, were inserted after the words “ other right ”, so that the clarified provision now reads, as already noted, “ a claim of title or other right to property”. As the Senate Report explains, the words were inserted ‘1 to make it clear that the law does not prevent banks, insurance companies and other financial institutions from using the act of state as a defense to multiple liability upon any contract, deposit or insurance policy in any case where such liability [sic] has been taken over or expropriated by a foreign state.” (S. Rep. No. 170 on S. 1837, 89th Cong., 1st Sess. [1965], p. 19; emphasis supplied.) Thus, not even contract rights which are taken over and are sought to be enforced in this country are covered by the Hickenlooper Amendment, much less claims for breach of a contract in a suit between the original parties to the agreement.
We may not ignore, or leave unexplained — as Judge Keating does — the fact that, when Congress, in 1965, wished to assure the preservation of the act of state defense for the benefit of American insurance companies and banks who were sued on contract claims, it chose to do so not by adding a carefully limited exception, but—as noted in the text above—by inserting the words, “ to property ”, after the words, “ claim of title or other right ” (see supra, p. 61). The use of these unqualified words can only signify that Congress decided to eliminate all contract *62 claims from the statute rather than attempt the more subtle task of distinguishing between contract cases in which the act of state defense might be asserted and those in which it might not. Judge. Keating may disapprove of Congress’ choice of a method for accomplishing its purpose, but that choice — by the plain evidence of the 1965 amendment and of the accompanying Senate Report—is the one that was made, and it is binding upon us.
In short, although, as Judge Keating observes, the statute may be “inexpertly drafted” or “inarticulately expressed” (opn., pp. 80, 85), it does not follow, as he intimates, that the court is relieved of the necessity of reading the language of the Statute closely or of drawing plain inferences from its legislative history. Despite its evident defects of draftsmanship, we must treat the Hickenlooper Amendment as nothing less than a serious attempt by Congress to define what it did mean and what it did not mean in a complex and important area of law.
From all that has been said, it is apparent that the Hickenlooper Amendment has no application to the present case. The present lawsuit does not involve the assertion of a claim of title to property and, just as clearly, the Cuban Government’s action did not involve a confiscation or taking of property. Certainly, it is not a case in which title or other right to a specific res (or its proceeds) confiscated by a foreign government is disputed on a claim either asserted by the original owner and defended by the government or asserted by the government and defended by the original owner.
It follows that the Hickenlooper Amendment is not applicable, that the act of state doctrine is decisive and that the defendant must prevail. This being so, it is not necessary to reach the further question whether the action of the Cuban Government offended principles of international law. Since, however, our dissenting brethren have concluded that such action did constitute a taking of property to which a claim of title or other right is asserted and have gone on to urge that it violated international law, we treat that question—of international law— briefly.[13]
*63 This is not an era, surely, in which there is anything novel or internationally reprehensible about even the most stringent regulation of national currencies and the flow of foreign exchange. Such practices have been followed, as the exigencies of international economics have required — and despite resulting losses to individuals—by capitalist countries and communist countries alike, by the United States and its allies as well as by those with whom our country has had profound differences. They are practices which are not even of recent origin but which have been recognized as a normal measure of government for hundreds of years, if not, indeed, as long as currency has been used as the medium of international exchange. (See Winkler, Foreign Bonds, an Autopsy—A Study of Defaults and Repudiations of Government Obligations [1933], p. 21; Mann, The Legal Aspects of Money [2d ed., 1953], p. 337.)
In short, the control of national currency and of foreign exchange is an essential governmental function; the state which coins money has “ power to prevent its outflow ” (Ling Su Fan v. United States, 218 U. S. 302, 311; see, also, Forts v. United States, 294 U. S. 317, 330, supra); and, as the court observed in Perry v. United States (294 U. S. 330, 356, supra), “ [t]he same reasoning is applicable to the imposition of restraints upon transactions in foreign exchange.” (See, also, Restatement, 2d, Foreign Relations Law of the United States, § 198, Comment 6.)[14] The Restatement finds no violation of international law in such a currency measure “if it is reasonably necessary in order to control the value of the currency or to protect the foreign exchange resources of the state ” (§ 198). The Restatement goes on to recite that ҅ ‘ the application to an alien of a requirement that foreign funds held within the territory of the state be surrendered against payment in local currency at the official rate of exchange is not wrongful under international law, even though the local currency is less valuable on the free market than the foreign funds surrendered. ’ ’ Thus, if the Cuban Government could, under the example cited, have properly required *64 an alien within its borders to surrender American dollars ‘ ‘ against payment ’ ’ in pesos, as a measure ‘ ‘ reasonably necessary * * * to protect the foreign exchange resources, of the state ” (Restatement, 2d, Foreign Relations Law of the United States, § 198), the present refusal of the Cuban Government to surrender American dollars in order to protect its dollar reserves, though harsh in its effect, would also seem to be within the limits of international legality.
In the case before us—whatever other economic measures the Cuban Government may have taken (and they are not reflected by evidence in the record) —there is no question that the actions complained of were aimed at protecting Cuba’s scarce “ foreign exchange resources.” The testimony of the defendant’s president that these actions were essential to prevent the wiping out of Cuba’s foreign currency reserves is uncontradicted. Accordingly, that country’s refusal to exchange Ritter’s pesos for dollars, though it may be deplored, may not be characterized as so unreasonable or unjust as to outrage current international standards of governmental conduct. Even if the present case,' then, involved “ a claim of title or other right to property ” within the meaning of the Hickenlooper Amendment, the amendment would not permit us to disregard the act of state doctrine since the Cuban action did not violate international law.
In sum, then, it is our conclusion that the actions complained of constituted an act of state; that, under the rule announced in Sabbatino, we are required to give effect to that act of state; and that, since the record before us establishes that there was no taking of property to which a claim of title or other right is asserted, the Hickenlooper Amendment does not apply to require us to disregard the act of state doctrine. Consequently, the plaintiff or her assignor may seek a remedy in this country only through diplomatic efforts by the United States and arrangements established by Congress for the protection of the interests of all American claimants against Cuba.
The order of the Appellate Division should be reversed, with costs, and the complaint dismissed.

. U. S. Code, tit. 22, § 2370, subd. (e), par. (2); 78 U. S. Stat. 1009 (1964), as amd. 79 U. S. Stat. 653 (1965).

. These certificates alone, and no other property of Bitter’s, are the subject of this action.

. Jurisdiction over the defendant was acquired by attaching an account which it maintained in a bank in New York City.

. See Underhill v. Hernandez, 168 U. S. 250; Oetjen v. Central Leather Co., 246 U. S. 297, 303; Ricaud v. American Metal Co., 246 U. S. 304, 310; Hewitt v. Speyer, 250 F. 367; Banco de Espana v. Federal Reserve Bank, 114 F. 2d 438, 443; Bernstein v. Van Heyghen Freres, 163 F. 2d 246, cert. den. 332 U. S. 772; Salimoff & Co. v. Standard Oil Co., 262 N. Y. 220; Dougherty v. Equitable Life Assur. Soc., 266 N. Y. 71; Holzer v. Deutsche Beichsbahn-Gesellsehaft, 277 N. Y. 474. The decision in Banco Nacional de Cuba v. Sabbatino (376 U. S. 398, 427) establishes that the scope of the act of state doctrine “must be determined according to federal law”.

. It is immaterial what form an act of state takes—whether it be an expropriation or confiscation, a conversion or a breach of contract (see, e.g., Hewitt v. Speyer, 250 F. 367; Holzer v. Deutsche Reichsbahn-Gesellschaft, 277 N. Y. 474, 479; Dougherty v. Equitable Life Assur. Soc., 266 N. Y. 71, 87-88) —as long as such act is committed by the foreign government within its own territory.

. We may note, initially, that we have not been cited to any “treaty or other unambiguous agreement regarding controlling legal principles” to which the Supreme Court’s reservation in Sabbatino might apply. In point o£ fact, Cuba withdrew, in 1964, from the International Monetary Fund Agreement, the only arguably applicable international instrument, and the defendant does not claim its benefits. In the absence of any such compact by which the court may be guided, we must conclude that the case is precisely within the sensitive area of fluid and uncertain foreign relations which Sabbatino declared to be outside the province of the judicial branch.

. This is the full text of the questions which we asked the parties to discuss on reargument:
“ (1) Whether or not the suspension of redemption of the tax exemption certificates here involved constituted or now constitutes a confiscation or taking within the meaning of the Hickenlooper Amendment to the Federal Foreign Assistance Act of 1961 *• * * so as to bar the defense of ‘act of state’; and *57 “ (2) Assuming that the first question be answered in the affirmative, whether or not, applying principles of international law, the suspension above referred to constituted a reasonable currency control regulation aimed at the protection of foreign exchange reserves or was otherwise valid under the Hickenlooper Amendment and whether or not the continued suspension of redemption constitutes a reasonable currency control regulation aimed at the protection of foreign exchange reserves which conforms with principles of international law.”

. In somewhat greater detail, the Hickenlooper Amendment recites (U. S. Code, tit. 22, § 2370, subd. [e], par. [2]; 78 U. S. Stat. 1009, 1013 [1964], as amd. 79 U. S. Stat. 653 [1965]):
“Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law including the principles of compensation and the other standards set out in this subsection: Provided, That this subparagraph shall not be applicable (1) in any ease in which an act of a foreign state is not contrary to international law 6 6 * or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.” (Emphasis supplied.)

. It has been suggested (opn. of Keating, J., p. 86) that the phrase, “ a claim of title or other right to property ”, should be construed broadly to include any property of a confiscating state which comes into the possession or control of our courts — even though that property is not itself the subject of the lawsuit but has simply been attached in this country for the purpose of acquiring jurisdiction. We find no basis for such a suggestion. It seems plain that the Hiekenlooper Amendment comes into operation only where there has been a confiscation of the very property to which a claim (of title or other right) is asserted. The Federal District Court Judge’s decision in Banco Nacional de Cuba v. First Nat. City Bank of N. Y. (270 F. Supp. 1004) —i to which Judge Keating points— is not to the contrary. The fact is that the claim to which the amendment was held applicable in that case was not the plaintiff’s claim for bank deposits and other funds held by the defendant First National — which, concededly, were at all times owing to the plaintiff — but, rather, the defendant’s claim for its own property in Cuba which had been • confiscated by the Cuban Government and the value of which First National demanded as a setoff in the action. Consequently, the Federal District Court actually had no occasion to express any opinion in the First National City Bank case as to whether the monies held by the defendant First National were covered by the language, “ right to property ”.
Moreover, the confiscation alleged in the First National case included a divesting of the defendant bank’s contracts, not a breach of them, by the Cuban Government. Indeed, the District Court Judge did not hold that First National could recover compensation for the loss of these contract rights. Not even referring expressly to the subject of contract rights, he merely noted that “ [t]he actual amount of the set-off which can be asserted here poses delicate questions of fact and law requiring further careful consideration” (270 F. Supp., at p. 1011).

. There can be ho doubt that this would be the appropriate choice of law, under “ traditional ” as well as more recently formulated standards. (See, e.g., Auten v. Auten, 308 N. Y. 155, 160; Matter of Havemeyer, 17 N Y 2d 216.)

. In addition, Congressman Adair, who spoke in support of the enactment, pointed out that it was designed to permit a party who had suffered an “expropriation” in violation of international law to bring suit “to assert his claim to the expropriated property if there is an attempt to market it in the United States ” or to enable him to “ resist a suit by the expropriating government to seize the property ” (Congressman Adair, 110 Cong. Rec. 23680) and the Attorney General of the United States (Mr. Katzenbach), who spoke in opposition to the bill, noted in the course of his remarks that the amendment dealt with a “ very isolated, infrequent occurrence * * * when American property that has been nationalized * * * finds its way back in the United States.” (Hearings Before House Committee on Foreign Affairs on H. R. 7750, 89th Cong., 1st Sess. [1965], p. 1235; see, also, Prof. Olmstead, Hearings Before House Committee, ibid., 578; Prof. Metzger, ibid., 1025, 1026, 1028, 1030-1031.)

. Senator Hickenlooper’s proposal, made as an amendment to the Foreign Assistance Act of 1964 (H. R. 11380), was included in the full bill as reported out of the Senate Committee on Foreign Relations (S. Rep. 1188 [July 10, 1964], at pp. 24, 37),

. The plaintiff, in order to prevail under the Hickenlooper Amendment (supra, n. 8, p. 57), must show not only that the action complained of constituted a taking of property but also that it violated principles of international law.

. It may be noted that this country’s Cuban Assets Control Regulations (Code of Fed. Reg., tit. 31, Pt. 515)—promulgated by the Secretary of the Treasury — provide that all transactions in foreign exchange between the United States and Cuba or the citizens of those countries are prohibited unless licensed by the Treasury Department.