Fuchsberg and Cooke, JJ. (dissenting).
We would reverse the order of the Appellate Division and would reinstate and confirm the order of the City of New York Commission on Human Rights and grant the cross motions for enforcement of the order. The record before the commission was more than sufficient to support its determination that the advertisements were impermissibly discriminatory and that the discrimination was so pervasive that the remedial action ordered by the commission, though broad, was within its discretion.
Color discrimination in employment is deplorable; it is the duty of the courts to make sure that the salutory purposes of the legislative body in enacting the human rights law of the City of New York are not thwarted by a combination of a strict construction of the Administrative Code and a battle over semantics (cf. City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 428). The code makes clear that neither color discrimination nor other "unlawful discriminatory practice” defined by it are to be permitted.
Thus, the Administrative Code of the City of New York forbids, as an "unlawful discriminatory practice,” the printing by any employer or employment agency of any statement, advertisement or publication "which expresses, directly or indirectly, any limitation, specification or discriminaion as to age, race, creed, color, national origin or sex, or any intent to make any such limitation, specification or discrimination, unless based upon a bona fide occupational qualification” (§ Bl-7.0, subd 1, par d). More pertinent, it is also "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this title [tit B—which includes § Bl-7.0], or to attempt to do so” (subd 6).
A review of South African law, as introduced before the commission and as there verified for meaning and application by expert testimony, shows it to be elaborate and all-embracing in its mandates for racial segregation. A few examples will *358 suffice for illustrative purposes. South Africa’s Population Registration Act of 1950 requires racial registration and classification of all alien workers; the Group Areas Act of 1966 restricts all interracial property transactions or occupational changes so that whites and blacks will continue to work and live apart; the Factories, Machinery and Building Works Act of 1941 compels separate eating, lavatory and other amenities; Proclamation No. 329 of 1957 absolutely prohibits a black from holding a job as a "charge hand, executive, professional, technical, or administrative” employee or as a "manager or supervisor”; the Industrial Conciliation Act of 1956, which establishes white trade unions with collective bargaining power, excludes blacks.
In this case, the commission, under its heading of "Conclusions of Law”, found "that the advertisements do constitute 'an unlawful discriminatory practice * * * aid[ing or] abetting]’ the offending offer of employment by the employer or employment agency under Title B, Section Bl-7.0-1 (d) and (6)”, that "the advertisements in question '[express] * * * discrimination’ within the prohibition of the City Statute” and that "the advertisements do constitute 'aid[ing or] abet[ting]’ within the meaning of Section Bl-7.0-1 (d) and (6).” It pointed out, citing specific enactments, that "[e]ven a cursory reading of . the applicable foreign law establishes that the advertisements violate our statute in that the laws of the Republic of South Africa clearly provide for racial discrimination in hiring and in terms and conditions of employment in general”, that "[t]here was no evidence offered by Respondent to show that these clearly discriminatory laws and regulations are not in force or are not enforced” and that "[t]hus the evidence establishes that the employment opportunities offered by the advertisements are not available on a racially non-discriminatory basis and that Black citizens of New York City, who might avail themselves of such employment positions, would be subject to segregation in the facilities and accommodations of the workplace.”
The commission also stated that the evidence established that, among residents of New York City, particularly blacks, "the extensive system of racial segregation and discrimination in the Republic of South Africa is well known”, and that "South Africa” has acquired "a denotative meaning, in the common understanding, other than its geographical reference —i.e., the principle of white supremacy expressed in laws *359 which require racial segregation in many areas of activity and in particular in employment.” In summary, the commission concluded that the advertisements for employment in South Africa under review "are expressive of discrimination and that their printing * * * is in violation of Administrative Code Section Bl-7.0”.
Since the findings of fact included in these expressions by the commission are supported by sufficient evidence on the record considered as a whole (see, e.g., majority opn, pp 348, 349), they are conclusive and should not be disturbed (Administrative Code, § Bl-9.0). In making those findings, it was not necessary that the commission detail all items of evidence (City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 424, supra). Therefore, the majority’s explicit holding "that advertisements of employment opportunities located within the Republic of South Africa which merely refer to that country as the situs of the employment and which do not recite, on the surface, any discriminatory conditions do not express discrimination within the meaning of the New York City anti-discrimination laws” (emphasis added) would seem to overlook the reality that "[discrimination today is rarely so obvious, or its practices so overt that recognition of the fact is instant and conclusive” (State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 209) and that "code” words, while innocuous on their face, nonetheless effectively convey a message of discrimination. Accordingly, code words which achieve the connotative effect of communicating such discrimination may be dealt with as discriminatory, even where the denotative meaning of the words or phrases in issue is an innocent one (see United States v Hunter, 459 F2d 205, cert den 409 US 934; Camp-of-The-Pines v New York Times Co., 184 Misc 389 Hodgson v Approved Personnel Serv., 529 F2d 760).
To deal with that problem the prohibition contained in the Administrative Code applies to advertisements which "directly or indirectly” express any "discrimination as to age, race, creed, color, national origin or sex”. That means the commission was to look to fact and not facade and, in doing so in this case, it was well within its power to conclude that the universality of discrimination in employment in South Africa made the geographic reference in an advertisement seeking candidates for such employment more than just a reference to a place. An advertisement setting forth South Africa as the location of the employment clearly connotes, as effectively as *360 code words, that "Only Whites Need Apply”. It also seems to us that it begs the question to place significance in the fact that the place name was part of an otherwise "complete lawful advertisement”. Obviously, a word which signals discrimination does so no less because it conveys other information as well.
To support its position, the majority recites the classic American statement of the Act of State Doctrine found in Underhill v Hernandez (168 US 250, 252) (p 352) and concludes that, whether a foreign country has been recognized by our Government or not, it is impermissible for a State court to review foreign actions and policies (p 353). But the Act of State Doctrine, in its traditional formulation, precludes courts in the United States from inquiry into the validity of the acts of a foreign government done within its own territory (Alfred Dunhill of London, Inc. v Cuba, 425 US 682, 697; Banco Nacional de Cuba v Sabbatino, 376 US 398, 427; French v Banco Nacional de Cuba, 23 NY2d 46, 52; Salimoff & Co. v Standard Oil Co., 262 NY 220, 224). Here, the commission is not reviewing acts of the Republic of South Africa or of its agents or representatives at all (cf. Alfred Dunhill of London, Inc. v Cuba, supra; French v Banco Nacional de Cuba, 23 NY2d 46, 52, supra). South Africa is not a party to this proceeding. Above all, the order of the commission makes no attempt to decide or determine the rights of South Africa to engage within that Nation in what we would regard as discrimination.
The essence of the Act of State Doctrine is that the proper conduct of foreign relations of any Nation requires respect for the act of any other sovereign state committed "within its own territory” (see David v Veitscher Magnesitwerke Actien Gesellschaft, 348 Pa 335, 345-346). The significant phrase "within its own territory” precludes inquiry by a court in the United States as to the validity of acts of foreign states affecting property located within, or contracts governed by the laws of such states; it does not bar inquiry affecting or purporting to affect property not located within, or contracts not governed by, the acting state, except where a treaty, law or public policy prevents such an inquiry (see United States v Pink, 315 US 203, 230; Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d 220, 228, cert den 423 US 866; Gonzalez v Industrial Bank [of Cuba], 12 NY2d 33, 39; Anderson v N.V. Transandine Handelmaatschappij, 289 NY 9, 19-20; Republic of China v *361 Pang-Tsu Mow, 101 F Supp 646, affd in part and dsmd in part 201 F2d 195, cert den 345 US 925; Restatement, Foreign Relations Law of the United States 2d, § 43, Comment c; 45 Am Jur 2d, International Law, § 87; Act of State Doctrine, Ann., 12 ALR Fed 707, 775-776). No "treaty or other unambiguous agreement regarding controlling legal principles”, as mentioned in Sabbatino (376 US, at p 428), has been cited to act as a basis for exception here. There being no present policy of the executive branch of the United States Government (see US Const, 14th, 15th Arndts) requiring acquiescence in the United States in the discrimination practiced by the South African government, the well-established policy of New York State against such acquiescence is operative (Gonzalez v Industrial Bank [of Cuba], 12 NY2d 33, 39, supra; see Executive Law, § 290 et seq.).
It has also been held that the phrase "within its own territory” means that an Act of State that precludes inquiry must be one which has been executed within the acting state’s territory; otherwise, inquiry into its legality is not precluded (Victory Transp. v Comisaria General de Abastecimientos y Transportes, 336 F2d 354, 362-363, cert den 381 US 934). Here, the aiding or abetting of the unlawful discriminatory practice was not accomplished in South Africa, but in New York.
Moreover, the commission has not decreed that the South African government cease and desist its discrimination in South Africa, but has ordered a New York corporation, which is not the legal representative or agent of a foreign government at all and which publishes a newspaper in the City of New York, to cease and desist from printing advertisements which the commission has found aids and abets the discrimination, and thus itself constitutes an unlawful discriminatory practice within the prohibitions of section Bl-7.0 of the Administrative Code of the City of New York.
It also follows from the foregoing analysis that, whatever may have been the precipitating motivation of those who originally brought this matter to the official attention of the commission, the limited conduct which was the gravamen of the proceeding before the commission here simply was not a boycott and, therefore, the discussion of it as such by the majority is besides the point.
Finally, the newspaper’s well-articulated freedom of the press argument is also inapplicable. Even the most broadly *362 defined concept of First Amendment rights, one which makes no distinction whatever between commercial and noncommercial speech (see Bigelow v Virginia, 421 US 809; Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748), cannot serve to protect the publication of discriminatory material such as that before us now. In both of those recent cases, the United States Supreme Court took pains to preserve so much of Pittsburgh Press Co. v Human Relations Comm. (413 US 376) as was directed to the publication of discriminatory advertisements, and the rationale of the Pittsburgh case is fully applicable here.
Chief Judge Breitel and Judge Wachtler concur with Judge Jasen; Judge Jones concurs in a separate opinion in which Judge Gabrielli concurs; Judges Fuchsberg and Cooke dissent and vote to reverse in another memorandum.
Order affirmed, with costs.