Abraham J. Gellinoff, J.
This is an action for damages by the holder of a fractional share of a royalty interest in certain oil concessions which had been granted by the government of Venezuela to defendants. Defendants move to dismiss the complaint on various grounds.
Prior to January 1, 1976, defendant Creole Petroleum Corporation, the wholly owned subsidiary of defendant Exxon Corporation, was the holder of oil concessions pursuant to agreements which it had entered into with the Venezuelan government. These concessions permitted Creole to explore for, produce and sell crude oil found in specified areas of Venezuela. Holders of such concessions frequently granted interests known as royalties. Such royalties constituted a contingent participation by one other than the concessionaire, in a percentage of the production of oil from the particular concession. Through various mesne conveyances, not here relevant, plaintiff became the owner of a royalty in two concessions held by Creole.
By an act effective January 1, 1976, the Venezuelan government nationalized the oil industry, and extinguished all concessions. Its nationalization law provided for indemnification to concessionaires for the assets appropriated. Defendant Creole entered into negotiations with the Venezuelan government for indemnification, and an agreement was ultimately reached. Defendant Exxon also entered into negotiations with the Venezuelan government, which resulted in an agreement under which Exxon renders certain technical assistance to the government and its oil companies, and is permitted to purchase a certain amount of Venezuelan oil for resale.
In his complaint, which he asserts on his own behalf, and on behalf of all other royalty holders, plaintiff contends — in substance — that royalty holders are entitled to a share of the indemnification paid concessionaires by the Venezuelan government. He further alleges that the contracts to render assistance, and to purchase oil "are substantially equivalent to the concession rights which Creole has given up, in which *982 concessions plaintiff and the members of the class possessed royalty interests.” And he therefore contends that he is entitled to a share of the compensation paid to defendants by the Venezuelan government, and the profits from the resale of Venezuelan oil, in the same proportion as before nationalization. Finally, the complaint asserts that defendants, in negotiating with the Venezuelan government for their own interests, without similarly negotiating for the royalty holders, are guilty of breach of trust, and breach of a confidential relationship.
In the motion currently before the court, defendants move to dismiss the complaint on various grounds. They urge that this court lacks subject matter jurisdiction, and that only the courts of Venezuela may hear this action. They further contend that plaintiff lacks capacity to maintain the action. Finally, they argue that the "act of state” doctrine mandates dismissal of the complaint. Each of these grounds shall be separately considered.
THE APPROPRIATE FORUM
Defendants assert that, pursuant to Venezuelan law — and New York choice of law rules — as well as the agreements between the parties, Venezuela is the only forum in which this action may be tried. They also urge that the complaint should be dismissed on the ground of forum non conveniens.
The constitution of Venezuela contains what is known as a "Calva clause”, providing that: "No contract of public interest entered into with the Federal Government or with the States or with the Municipalities or with any other Public Authority may be assigned, wholly or in part, to foreign governments; and in all such contracts the following clause will be deemed incorporated, even if not expressed: 'Doubts and controversies of any nature which may arise from this contract, and that cannot be amicably resolved by the contracting parties, will be decided by the competent courts of Venezuela, in accordance with its laws, and they may not for any reason give rise to foreign claims’.”
Defendants claim that since, under the law of Venezuela, the rights and obligations of royalty holders are subject to the terms and conditions of the underlying concessions, this "Calva clause” provision, which was in fact incorporated in the concession agreements between Creole and the Venezuelan government, bars the instant action.
*983 However, defendants have failed to establish that the "Calva clause” is applicable to the royalty agreements. For the royalty agreements, as distinguished from concession agreements, have not been declared contracts "of public interest” by the Venezuelan government. Besides, the subject royalty agreements are not contracts "entered into with the Federal Government.” They are private agreements between the holders of concessions and third parties, with respect to the division of the profits from the concession holders’ operations. They do not involve the rights, duties or obligations of the Venezuelan government in any respect.
Thus, while the royalty holder must take his interest subject to the vicissitudes of the underlying concession, defendants have not shown that under Venezuelan law any dispute between the concession holder and the royalty holder — not involving the government — is subject to the constitution’s "Calva clause.” Defendant’s expert asserts, in his supplemental affidavit, that, "a restriction or other modification en-grafted upon a concession by legislative act or other valid governmental act constituted a commensurate restriction upon the rights of the holder of a royalty derived from the same concession.” But that statement does not, as defendants urge in their brief, imply that the "Calva clause” should apply to the separate royalty agreements between private persons. Moreover, defendants’ interpretation conflicts with another provision of Venezuelan law, which states, inter alla, that incorporation of the "Calva clause” does not "affect the rights acquired by third parties by virtue of agreements entered into with the concessionaire or for any other reason” (1943 Hydrocarbons Law, art 102 [7]).
The court concludes, therefore, that defendants have not established that Venezuelan law mandates that this action be tried before the courts of that country.
Defendants further contend that, in one of the two royalty agreements at issue, it was agreed that the royalty holder "elect[s] this city [Caracas] as a special domicile for all effects of the present contract, its proceedings and consequences, subject to the jurisdiction of the Courts of the Federal District.”
Nothing in the royalty agreement, however, purports to elect Caracas as the sole domicile of the parties with respect to the contract. Thus, unlike the situation in the cases relied upon by defendants (see, Bremen v Zapata Off-Shore Co., 407 *984 US 1; Fireman’s Fund Amer. Ins. Co. v Puerto Rican Forwarding Co., 492 F2d 1294; Export Ins. Co. v Mitsui S.S. Co., 26 AD2d 436) the instant clause does not constitute an exclusive choice of forum, but, instead, merely permits personal jurisdiction in Caracas, without compelling it.
Indeed, this interpretation would appear, from the papers submitted on this motion, to comport with Venezuelan law. Thus, as appears in American-Venezuelan Private International Law, by Lombard (1965) (p 93), "Article 82 of the [Venezuelan] Code of Civil Procedure provides for contractual 'election of a special domicile,’ which confers jurisdiction upon the courts of the elected domicile; this jurisdiction is not exclusive unless otherwise agreed.”
Defendants, quoting another part of the Lombard treatise (p 93), urge that "Nevertheless, there is a tendency among many Venezuelan lawyers to assume that statutory grants of jurisdiction to [the Venezuelan] courts are grants of exclusive jurisdiction.” But such a "tendency among many Venezuelan lawyers” hardly constitutes a definitive statement of Venezuelan law.
On the current state of the record, this court is unable to conclude that Venezuelan law interprets the subject clause of the agreement as conferring exclusive jurisdiction upon Venezuelan courts.
Finally, defendants urge that New York is an improper forum, and that the action should be tried only in the courts of Venezuela, on the ground of forum non conveniens. The court is not persuaded.
Plaintiff is a New York resident. Defendant Exxon is a New Jersey corporation with its principal place of business in New York. Defendant Creole, Exxon’s subsidiary, previously had its principal offices in Caracas, Venezuela, but has now moved them to Hamilton, Bermuda. While many of the issues in this lawsuit involve activities in Venezuela, many also involve actions taken by defendant Exxon from its New York office. Accordingly, New York has an adequate nexus with this action to warrant retention of jurisdiction here (cf. Hormel Int. Corp. v Andersen & Co., 55 AD2d 905).
Moreover, it appears at least open to question whether Venezuela would be an adequate alternative forum. Venezuela does not seem to have a form of action equivalent to our class action. Indeed, it is not clear that the courts of Venezuela *985 would take jurisdiction of this litigation, involving, as it does, a private dispute between foreign nationals.
In sum, the court finds that neither Venezuelan law, the royalty contracts at issue nor considerations of forum non conveniens require that jurisdiction of this action be placed in Venezuela.
plaintiff’s capacity to maintain this action
One of plaintiffs royalty agreements contains a provision that: "It is expressly agreed that Venezuelan Eastern [the prior concessionaire] will acknowledge only one title holder in all matters concerning the aforesaid royalty of two and a half per cent.”
The other royalty agreement provides, as pertinent, that: "It is expressly agreed that 'Venezuelan Pantepec Company’ [the prior concessionaire] will acknowledge only one title holder in regard to all matters concerning this share or royalty and, therefore, in case it should belong to sundry persons, all of them will have the obligation to elect only one representative, with whom the concessionaire will deal in all matters.”
Upon the assignment of a portion of the royalty rights to plaintiff, plaintiff executed an agreement which provided, inter alla, "That I designate the corporation Compañía Anónima Caracas Petroleum, S.A. * * * as the collection agent of my aforesaid principals, with respect to the product of the royalty rights or shares assigned and conveyed to them, as evidenced herein. Likewise, I designate the above-mentioned Caracas Petroleum, S.A. as representative of my principals before the sundry oil companies liable for the aforesaid royalty rights or shares, in all that concerns such rights, but without authority to dispose of them in any manner whatsoever.”
And, upon the assignment of royalty rights to plaintiff, the assignor’s liquidator wrote to defendant Creole, who by then had succeeded to the rights of concessionaire, advising that: "The royalties pertaining to * * * [plaintiff and other royalty holders] shall be forwarded by you, with previous withholding of the applicable income tax, through one check issued in the name of Caracas Petroleum, S. A., such company having been designated by said assignees their agent for the collection of royalties, in the same assignment documents attached hereto.” Defendants contend that the effect of these provisions is to *986 create an agency in Caracas Petroleum as representative of plaintiff for all purposes with respect to the royalties, and that, plaintiff therefore lacks capacity to maintain this action in his own name.
However, interpreting the relevant documents, and the surrounding facts, the court concludes that the appointment of Caracas Petroleum was solely as collection agent, for the convenience of the concessionaire, and that nothing in the agreements in any way constitutes an assignment of the right to sue for breach of the royalty agreement.
In those cases where the courts have held that the right to sue has been assigned, such restriction has been expressed with specificity. Thus, in Levy v Paramount Publix Corp. (149 Misc 129, affd 241 App Div 711, affd 265 NY 629), relied upon by defendants, the indenture provided that "no individual bondholder may bring an action 'on or in respect of the bonds,’ unless he shows that the holders of twenty-five per cent in amount of the bonds have made a demand upon the trustees to sue and been refused.” (pp 133-134). In Greene v New York United Hotels (236 App Div 647, affd 261 NY 698, 699), also relied upon by defendants, the indenture provided that "no holder of any Debenture * * * shall have any right to institute any action” unless the trustees refused a demand by 25% of the bondholders to bring suit.
By contrast, the agreements here at issue provide only that the concessionaire will "acknowledge” and "deal” with but one representative, but are entirely silent as to the right to sue.
Indeed, the representative itself has recognized the limited scope of its authority. For, Caracas Petroleum wrote to plaintiff, and the other royalty holders, saying:
"As you may know, the Government has announced that the oil industry will be nationalized this year and indications are that your royalty holdings will cease at that date.
"As you are no doubt aware, Caracas Petroleum, S.A. acts as your receiving, paying and tax agent only and in such limited capacity cannot act to preserve your interest in this regard should such nationalization occur. Should you feel that such representation would be in your best interest, we suggest you obtain independent legal counsel.”
And, Caracas Petroleum thereafter wrote again, that: "We again call your attention to the fact that we act only as your *987 receiving, paying and tax agent and that as to matters involving nationalization of the oil interests which are the source of your royalties, you will have to act independently and retain your own counsel should you believe this advisable.”
Plainly, Caracas Petroleum did not consider the documents relied upon by defendants to have made it plaintiffs agent for litigation purposes. Neither does the court.
APPLICABILITY OF THE ACT OF STATE DOCTRINE
The gravamen of plaintiffs complaint is that, upon nationalization, defendants received indemnification, and entered into various agreements with the government of Venezuela, so that, while the form is different, defendants’ rights and interests are now identical to those they formerly enjoyed as concessionaires. Therefore, plaintiff alleges, he remains entitled to his equivalent share of those benefits to which he was entitled under the royalty agreements.
Defendants assert, however, that the nationalization law, while allowing indemnification, "forbids” indemnification for concession rights. And they urge that since plaintiff had no interest in physical equipment, but only in concession rights, a judgment of this court in favor of plaintiff "would require this court to determine that the Venezuelan government acted contrary to the express provisions of Venezuelan law”. Such determination, defendants contend, is prohibited by the "act of state” doctrine.
"The classic American statement of the act of state doctrine” was reiterated by Mr. Justice Harlan in his opinion for the court in Banco Nacional de Cuba v Sabbatino (376 US 398, 416): " 'Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.’ ”
The court made it clear (p 418), however, that this rule " 'does not deprive the courts of jurisdiction once acquired over a case. It requires only that, when it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit *988 of the result cannot be questioned but must be accepted by our courts as a rule for their decision.’ ”
And, while agreeing that the act of state doctrine does not appear in the written constitution, the court stated (p 423) that: "The act of state doctrine does, however, have 'constitutional’ underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country’s pursuit of goals both for itself and for the community of nations as a whole in the international sphere.”
In the Sabbatino case, the owner of a shipload of sugar challenged a determination of the government of Cuba, expropriating the sugar, as violating Cuba’s own laws, and international law. The court, however, held (p 428) that "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.”
Subsequent cases have followed the holding, and rationale, of the Sabbatino decision. Thus, in French v Banco Nacional de Cuba (23 NY2d 46, 52) our Court of Appeals, per Chief Judge Fuld, stated that: "Our courts will not examine a foreign law to determine whether it was adopted in conformity with the internal procedures and requirements of the enacting state. The act of state doctrine, it has been well said, is not limited to situations in which 'the foreign act is committed in a manner "colorably valid” under foreign law. It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal. * * * So long as the act is the act of the foreign sovereign, it matters not how grossly the sovereign has transgressed its own laws. ’ ” (Emphasis in the original.)
And, recently, in Hunt v Mobil Oil Corp. (550 F2d 68), the United States Court of Appeals, in rejecting, on the basis of *989 the act of state doctrine, a claim that defendant oil companies had conspired to influence the government of Libya to nationalize plaintiffs assets, said (pp 72-73, 77):
"Hunt’s complaint does not name Libya as a defendant or in any way suggest that it is a co-conspirator of the named defendants. Nonetheless Judge Weinfeld [in the decision below] reasoned that the combination or conspiracy charged did not of itself cause the damage complained of but rather that the damage resulted from the action of Libya in cutting back Hunt’s production, shutting off its oil and finally nationalizing its properties. Thus he found that Hunt would be required to establish that but for the conspiracy Libya would not have committed any of these aggressive actions. This he decided would require judicial inquiry into 'acts and conduct of Libyan officials, Libyan affairs and Libyan policies with respect to plaintiffs as well as other oil producers’ properties and the underlying reasons for the Libyan government’s actions.’ * * * He concluded that this inquiry was foreclosed under the act of state doctrine. * * * We conclude that the political act complained of here was clearly within the act of state doctrine and that since the disputed pleadings inevitably call for a judgment on the sovereign acts of Libya the claim is nonjusticiable. * * * While the skilled pleader here has meticulously attempted to avoid the issue of validity, its claim is admittedly not viable unless the judicial branch examines the motivation of the Libyan action and that inevitably involves its validity”.
If, then, the instant complaint questions the validity of an act of the Venezuelan government, or seeks to go behind such governmental act to determine its underlying reasons and motivations, then the act of state doctrine precludes this court from passing upon such allegation. However, the allegations of the complaint before the court do not require into the legality of, or motivation behind, the enactment or enforcement of the nationalization law. The complaint merely recites certain objective acts allegedly performed by the Venezuelan government — without challenging their propriety — and contends that those acts affect the contractual relationship between the private parties now before the court. Unlike the Sabbatino, French and Hunt cases, the complaint here does not accuse the Venezuelan government of acting beyond its authority, or out of ill motive. It seeks no "redress of grievances by reason of such acts” nor does it "call for a judgment on the sovereign *990 acts” of Venezuela. Accordingly, the act of state doctrine is inapplicable.
Moreover, while defendants base their act of state argument on their construction of Venezuelan law as forbidding indemnification for anything other than the physical assets of the former concessionaires, and as limiting the rights of royalty holders to a share of the concession rights — not the concessionaires’ physical assets — this court, upon the current record, is unable to agree with that construction.
Thus, the nationalization law provides, in article 15, that "For all the legal purposes and effect of this Law, including the expert accounting appraisal as referred to in subdivision (e) of Article 13 hereof, the amount of the indemnification for the rights over the assets expropriated shall not exceed the net value of said assets, plants and equipment, meaning by this the purchase price thereof, less the amount of the accrued depreciation and amortization on or before the date of the expropriation petition, according to the Books used by the respective Concessionaire for income tax purposes.”
Defendants argue, through the affidavit of their proffered Venezuelan law expert, that this article "forbids the giving of compensation to the concessionaires for the extinguishment of their concessions or for any rights therein” (emphasis in original). Of course, the court is not bound to accept defendants’ expert’s interpretation of Venezuelan law. "The statute being in evidence, its construction [is] for the court” (Matter of Masocco v Schaaf, 234 App Div 181, 185). And, this court finds nothing in article 15, as above quoted, which "forbids” compensation by the government to its concessionaires for any particular rights. Rather, the provision limits the "amount” of compensation. Besides, it is unclear that the "assets” mentioned in article 15 refer only to physical assets.
But even if the court were to agree with defendants’ argument that Venezuelan law "forbids” the acts plaintiff alleges the government of Venezuela undertook, consideration of this argument would itself be precluded by the act of state doctrine. For, that doctrine does not bar inquiry into what the Venezuelan government in fact did; but it does bar judicial consideration of whether what it did was in violation of its own or international law.
For the foregoing reasons, defendants’ motion to dismiss the complaint, on the grounds urged, is in all respects denied.