**Harry T. JOHANSEN, Jr., individually and as Executor of the Last Will and Testament of Gladys Johansen, and Hortense Justiz de Turull, Plaintiffs,**

v.

**CONFEDERATION LIFE ASSOCIATION, Defendant.**

**No. 66 Civ. 2995.**

United States District Court,
S. D. New York.

May 7, 1970.

Royall, Koegel & Wells, New York City, for plaintiffs; David F. Dobbins, New York City, of counsel.

Lovejoy, Wasson, Lundgren & Ashton, New York City, for defendant; Walter C. Lundgren, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This action was begun in the Supreme Court, New York County, and was removed by defendant to this court on the ground of diversity of citizenship. The complaint contains two counts. The first seeks recovery of the amount allegedly payable by defendant upon two life insurance policies issued by it to Thomas Francis Turull y Belling (Turull), who died in 1961. Turull's widow, Hortense Justiz de Turull, was the beneficiary under policy No. 487534 issued on November 27, 1937. She claims $25,000. Turull's daughter, Gladys Turull Johansen, was the beneficiary under policy No. 515508 issued on July 17, 1939. She died after Turull. Her executor claims $25,000 on the policy.

The second count is asserted by Harry T. Johansen, Jr. Defendant issued its life insurance policy No. 681561 to him on October 8, 1946. He seeks a judgment declaring that defendant is obligated to accept premium payments from him in United States dollars, to make policy loans in United States dollars, and to pay the proceeds of the policy upon his death in United States dollars.

Defendant's answer, in addition to denials and various affirmative defenses, contains a counterclaim seeking a judgment declaring that all sums payable under these policies are payable only in Cuban pesos in Havana, Cuba, rather than in United States dollars in New York. The declaration thus requested is merely the opposite of that asked by Johansen. It is unnecessary, since the decision upon plaintiff's claims will determine the question. At the court's suggestion, defendant withdrew the counterclaim at the conclusion of the trial.

This case has an importance above and beyond the amount immediately involved. It raises a fundamental issue as to the nature and extent of defendant's obligation on policies of life insurance issued by defendant in Cuba to Cuban residents which provided that all sums payable thereunder, either by the in-

sured by way of premiums or by defendant, were to be paid in Havana, Cuba, in United States dollars. There were many such policies. This action is regarded by the parties, particularly by defendant, as a test case. It is apparently the first case which has been fully tried on the merits, although there have been a few decisions of other courts which have reached conflicting results, most of them rendered on motions for summary judgment.

The problem can be fully understood only after a consideration of the nature of the business carried on by defendant in Cuba. Much of the evidence was devoted to that subject. The relevant facts are as follows.

Defendant is a life insurance company organized under the laws of Canada in 1871. Its head office is in Toronto. It does business not only in Canada and in the United States, but in some twenty-two other countries, including Cuba. Since 1909 it has had a branch office in Havana in charge of a resident manager. For approximately fifty years, from 1909 until 1959, it issued policies to residents of Cuba.

Castro came to power in Cuba on January 1, 1959. Very shortly thereafter his government was recognized by the United States. Since Castro's advent, defendant has written no new policies in Cuba. Its office staff there has been greatly reduced from that of former years. Its activities are now limited to servicing existing policies and paying death claims in Cuba. The description of defendant's operations which follows, although phrased for convenience in the present tense, refers for the most part to the years prior to 1959.

The Cuban branch is not separately incorporated. It is a branch office which has always rendered daily reports of its operations to the head office in Toronto. Applications for insurance obtained by defendant's agents in Cuba are forwarded to the head office in Toronto for acceptance or rejection. Nevertheless, in a certain sense, defendant's operations in Cuba are distinct from those in Canada or in other countries. Defendant's business in Cuba, even before Castro, has always been subject to Cuban laws and to the supervision of the Cuban government. Defendant is required to render quarterly and annual reports of its operations to the government. A register of all Cuban policies is maintained by defendant which is inspected from time to time by government officials. Reserves to meet its obligations on those policies are maintained by defendant in Cuba. These reserves are invested in Cuban securities, particularly Cuban government bonds.

The Cuban government required that defendant make a deposit of $25,000 with the government when it began business in Cuba and a further deposit of $25,000 subsequently. Although prior to Castro the government did not specifically require that defendant's investments in Cuba be equal to its liabilities on its Cuban policies, it offered a strong inducement to that end by imposing a tax in the event that defendant's Cuban investments did not equal its Cuban liabilities. Defendant's investments in Cuba were not sufficient to avoid this tax until 1960. Other taxes are paid by defendant in Cuba, notably upon the premiums received upon policies issued there.

The policies issued by defendant in Cuba differ in some respects from those issued in Canada. Not only are they in the Spanish language rather than in English, but certain of the terms of the policies are different. The rates are different. Cuban residents must pay premiums at a "semi-tropical" rate, which is higher than that required of residents of colder countries. All policies must be authenticated before a notary in Cuba in order to become effective.

It has always been defendant's practice, in each of the countries in which it operates, to specify the capital city of the country in the policy as the place of payment. In Cuba the place of payment

is Havana. Turull's policy No. 515508 and Johansen's policy each stated:

"PLACE OF PAYMENT.—All sums payable or exigible under this policy shall be paid at the principal office of the Association in the city of *Havana, Republic of Cuba.*" [1]

Turull's policy No. 487534 contained the same provision but with the added qualification that "but the insured may, with the assent of the Association, make his payments elsewhere." All premiums paid by Turull under this policy were paid in Havana. There is nothing to indicate that he ever requested the privilege of paying any of them elsewhere.

With respect to currency, each of the three policies in suit provided that:

"CURRENCY.—All sums payable or exigible under this policy shall be paid in lawful currency of the United States of America."

This provision was common to all policies issued by defendant in Cuba up to July 1939. Between 1939 and 1951 defendant issued policies payable in dollars and also policies payable in Cuban pesos. From 1951 until it stopped issuing new policies in 1959, defendant issued only policies payable in pesos.

This came about because of certain Cuban currency laws and decrees which have an important bearing here and which may be briefly outlined at this point. From 1914 to 1939 two currencies were legal tender in Cuba, the peso and the United States dollar. Theoretically they were of equal value, but actually by 1939 the peso was worth less than the dollar. In an effort to bolster the peso, the Cuban government in 1939 enacted a law, effective on July 10, 1939, which in substance made the dollar and the peso interchangeable, on a one for one basis. Each continued to be legal tender, but debtors were now given an option as to which they wished to use in payment of their debts. Creditors were required to accept pesos in extinguish-

ment of an obligation expressed in dollars, and vice versa. By 1942, the peso had risen in value until it was worth at least as much as a dollar. Indeed, for a time in 1942, it sold at a slight premium.

In 1951 another significant change took place. In 1948, by virtue of Law No. 13, a central bank had been established in Cuba. The law provided that after a specified interval, pesos would be the only legal tender. Decree No. 1384 dated April 9, 1951, effective July 1, 1951, implemented this provision. The United States dollar ceased to be legal tender. All obligations had to be expressed and paid in pesos, the only legal tender. Obligations previously contracted in dollars were to be discharged in pesos, at the rate of one peso for one dollar. A man could still own dollars in Cuba, but he could not use them to pay debts. A dollar bank account could be maintained only as a savings account for the depositor's own convenience. No checking accounts in dollars were allowed.

The last step in this development occured after Castro's rise to power. Law No. 568, enacted on September 23, 1959, made it a criminal offense to hold dollars. Savings accounts in dollars were no longer permitted. Owners of dollars were required to turn them in to the central bank in exchange for pesos on a one for one basis. The peso has steadily diminished in value and at the present time is substantially worthless in terms of dollars.

It has been defendant's practice, in each of the various countries in which it operates, to issue policies payable in the currency which is legal tender in that country. Cuba was unique until 1951 in having two legal currencies. It would appear that strict adherence to this practice would have dictated that defendant issue policies in both currencies prior to 1939. For whatever reason, it

---

[1]. The word "exigible" appearing in the English translation of the policies is a literal translation of the Spanish word "exigibles." "Receivable" would be a more colloquial equivalent.

issued them up to that time only in dollars. When the peso became legally interchangeable with the dollar, however, in 1939, defendant considered it advisable to write policies in each currency. Obviously, when the dollar ceased to be legal tender in 1951, defendant had no choice but to issue policies thereafter payable only in pesos.

Between 1939 and 1951, holders of dollar policies were permitted, although not required, to make payment of their premiums in pesos. If they elected to pay in pesos, defendant was compelled to accept them. Many policyholders paid them in that currency. Some premiums, however, were paid in dollars. Under the 1939 law, defendant could have insisted on paying all claims maturing thereafter in pesos. Since the peso, at least for a time, was worth less than the dollar, to do so would have worked a hardship on policyholders who had paid some or all of their premiums in dollars. To prevent this inequity, defendant, between 1939 and 1951, kept a record of the currency in which an insured paid his premiums. Upon his death, defendant paid the death claim in similar fashion, i. e., if the insured had paid all his premiums in dollars, the death benefit was paid wholly in dollars; if the insured had paid 25 per cent of his premiums in dollars, the death benefit was paid 25 per cent in dollars and 75 per cent in pesos, etc.

The law of 1951 requiring all payments to be in pesos, was published in the official Gazette and was also given wide publicity in Cuban newspapers. Moreover, in 1951, defendant sent a notice to all its Cuban policyholders which, as translated into English, read as follows:

> "All premiums payable in accordance with this policy as well as all other liabilities contracted under the same and in which a reference is made to American currency, will from now on be payable in Cuban national currency at par, in accordance with Law No. 13 of 1948 and Decree No. 1384 of April 9, 1951."

An identical notice was stamped on all premium receipts sent to policyholders upon payment of their premiums after 1951. All premium notices bore the legend "MN" which stands for "Moneda Nacional," i. e., pesos. The policies themselves, however, were not formally amended to change the reference to dollars to pesos.

The uncontradicted testimony is that no policyholder made any complaint about these developments. All premiums on all policies were paid in pesos after July 1951. Defendant closed out all its dollar bank accounts and thereafter maintained accounts only in pesos. Defendant paid all death claims after 1951 in pesos as it was required to do by the 1951 law.

One further point should be noted. Prior to 1959, it occasionally happened that a resident of Cuba to whom defendant had issued a policy there changed his residence permanently, moving, for example, to New York. In a few instances the insured requested defendant to transfer his policy to New York and defendant granted that request. This involved a transfer of the policy from the Cuban register and the transfer to New York of funds equal to the reserve previously held by defendant against that policy in Cuba. The transfer required payment of an export tax to the Cuban government. Thereafter the policy was treated as though it had originally been issued in New York. Premiums were paid by the insured in dollars in New York and upon his death the face amount of the policy would be paid by defendant in dollars in New York to the beneficiary. No such transfer of Cuban policies has been possible since the advent of Castro, since it is now illegal in Cuba to transfer funds abroad, at least without the permission of the central bank, which under these circumstances would not be forthcoming.

Defendant maintains that to pay death claims on Cuban policies in dollars in New York at the present time would subject defendant to criminal penalties in Cuba. This is on the theory that

such a payment would involve the transfer of funds from Cuba in violation of present Cuban law. I am not persuaded that it would. Defendant has ample assets outside of Cuba with which to make these payments. In any event, there has been no showing that compliance by defendant with a judgment of this court in plaintiff's favor directing payment in dollars would subject defendant to prosecution in Cuba.

I turn now to the facts concerning Turull and Johansen and the policies which defendant issued to them. Turull was born in Brooklyn, New York, on January 27, 1888. As far as appears, he remained an American citizen throughout his life. When still a young man, he moved to Cuba. In 1911 he founded an export-import business in Havana which was eventually incorporated in the name of Compania Thomas F. Turull, S.A. The business prospered and Turull eventually accumulated substantial wealth in Cuba. He gave away almost all of it before his death to his daughters and his son-in-law, Johansen.

Turull married a Cuban. Their three daughters were born in Cuba. His residence and his domicile were in Cuba, although he came to the United States at times on business trips and for vacation trips during the hot weather. His roots were in Cuba. One may surmise that, but for Castro, he would have lived there throughout his life. In May 1959, however, five months after Castro came to power, and presumably because of that fact, he left Cuba forever. He and his wife took up residence in New York. He had no assets in New York of any substantial value. He died in New York on March 14, 1961.

Johansen was also born in Brooklyn on April 18, 1905. He is an American citizen. He was educated in this country and started out in business in New York. In approximately 1935 he met Turull's daughter Gladys who, although born in Cuba, was an American citizen. He married her in New York on November 7, 1941.

In April 1946, Johansen went to work for his father-in-law, Turull, in the latter's business in Havana. He moved to Cuba. Thereafter Cuba was his residence, although he made business trips to New York and customarily spent his vacations on Long Island. Cuba was his home and it is fair to say that in his case, as in Turull's, it was his domicile.

Johansen worked up in the management of Turull's company until he eventually became the operating head of it, as Turull gradually retired. Johansen amassed considerable wealth in Cuba. He had an elaborate home in Havana and substantial investments, worth "in the millions," in Cuban companies. Unlike Turull, he also had some assets, primarily a bank account and municipal bonds, in New York, worth, however, far less than his Cuban assets.

Johansen, like Turull, continued to live in Cuba until after Castro arrived. He left Cuba in 1960 and moved to New York. His wife died here in 1964. Johansen continues to reside here.

The parties are not in agreement as to where the three insurance contracts were made. I think it is clear that they were made in Cuba, where the insureds were living and where the policies were delivered to them. Turull applied for his first policy, No. 487534, in Havana, where it was solicited by an agent in defendant's Cuban office. The application was in Spanish. Turull underwent a medical examination in Havana. He asked for a policy with double indemnity and total disability provisions.

Defendant's Cuban office forwarded the application and the medical report to defendant's home office in Canada. The home office refused to issue the policy as requested. Because of Turull's physical condition, defendant was unwilling to include double indemnity or total disability clauses. It also insisted upon a "rated," i. e., a higher, premium for the first few years. It so advised the Havana office which in turn advised Turull. Turull in Cuba agreed in writing to accept defendant's terms. The policy,

in Spanish, was delivered to Turull in Havana in November 1937.

Turull applied for his second policy, No. 515508, in Havana. Again the application was in Spanish and the medical examination was held in Cuba. Again the application and the medical report were forwarded by the Cuban office to the defendant's home office in Toronto. In this instance, there were apparently no complications. Defendant's home office approved the issuance of the Spanish policy which, after proper notarial authentication, was delivered to Turull in Cuba in July 1939 against payment by Turull in Cuba of the first premium.

Johansen's policy was issued under circumstances similar to the first Turull policy. The Spanish application and medical report were forwarded by defendant's Cuban office to defendant's home office. The home office refused to issue the policy without a rated premium for a few years. Johansen in Cuba agreed to the higher premium and the Spanish policy, after notarial authentication, was delivered to him in Cuba in October 1946. A few years later, defendant agreed to reduce the premium to the regular rate.

All dividends on these policies were paid or credited in Havana, Cuba. All premiums were paid by Turull and Johansen in Havana. There is no evidence other than defendant's records as to the currency employed by Turull in making his premium payments. With respect to policy No. 515508, the records indicate that Turull paid his premiums in dollars from the inception of the policy in 1939 through 1949 and that thereafter until his death he paid his premiums in pesos. With respect to policy No. 487534, defendant's records are not entirely complete as to the currency employed by Turull in certain years. Such records as there are, however, indicate that Turull followed the same practice with this policy as with the other, that is to say, that he paid his premiums in dollars from

the inception of the policy in 1937 at least through 1948, and that thereafter he paid his premiums in pesos.[2]

As to Johansen, there is a slight conflict in the testimony. Johansen testified that he paid all the premiums in pesos from the inception of the policy in 1946. Defendant's records bear this out in the main, but they do indicate that Johansen paid his first three premiums in 1946, 1947 and 1948 in dollars. I so find. Johansen stopped paying premiums after 1960. Since then they have been advanced by the company and charged to an automatic premium loan.

Johansen testified that he did not recall receiving any of the notices sent out by defendant in 1951 and thereafter which, as previously mentioned, stated that all premiums and "all other liabilities contracted" under the policy should henceforth be paid in Cuban national currency at par. There is no evidence as to whether Turull received these notices. In view of the evidence, which I accept, that the notices were sent to all holders of dollar policies, there is no reason to doubt that they were sent to Turull and Johansen and received by them. I so find. I also find that Turull and Johansen, both of whom were active businessmen in Cuba at the time, were well aware of the 1951 law which required them to accept pesos on a one for one basis in discharge of dollar obligations.

Neither Turull nor Johansen ever requested defendant to transfer their policies from the Cuban registry to New York. After Turull's death, his company in Havana notified defendant's Havana office which, on March 29, 1961, replied that it would "proceed with the case" as soon as it received a death certificate and other documents. It does not appear that these documents were ever submitted to defendant's Havana office. Instead, on February 16, 1962, Turull's widow and his daughter sent death certificates and other documents

2. In one or two years Turull's premiums were paid in the first instance by an automatic premium loan. This has no bearing on the problem.

to defendant's home office in Toronto and demanded that the face amount of the policies be paid to them in dollars in New York. Defendant declined to do so, stating that it was ready and willing to pay the death claims in pesos in Havana.

In 1966 Johansen tendered to defendant an annual premium on his policy in dollars. Defendant refused to accept it. In order to prevent the policy from lapsing, defendant has treated all premiums on the policy since Johansen left Cuba in 1960 as being paid by an automatic premium loan.

■ These are the relevant facts. I must now determine their legal effect. If the legal question is considered to be one of conflicts of laws, as the parties seem to view it, this court in this diversity case must apply the conflicts rule of New York. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ The New York cases leave no doubt in my mind that a New York court would hold, as a matter of conflicts, that plaintiffs' claims are governed by Cuban law. This is true both under traditional theories of conflicts exemplified by Dougherty v. Equitable Life Assurance Society of the United States, 266 N.Y. 71, 193 N.E. 897 (1934), and under the modern "center of gravity" or "grouping of contacts" theory of Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954). *See* French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 59, 295 N.Y.S.2d 433, 242 N.E.2d 704, 713 (1968).

Plaintiffs' claims here are based upon contracts. The contracts were made in Cuba. According to their terms they were to be performed in Cuba. Substantially all the contacts are Cuban. Turull and Johansen were Cuban residents and domiciliaries. They paid their premiums in Cuba. The policies were enrolled on defendant's Cuban register. Defendant's reserves on these policies were maintained in Cuba. The policies were never transferred to New York, as they might have been if the insureds had requested it. The only contact with New York is that Turull moved here shortly before his death and died here, and Johansen has lived here since 1960. Neither Turull nor Johansen had any dealings with defendant in New York. Their dealings with defendant were in Cuba. Their late change of residence, in my opinion, is purely fortuitous and has no importance.

The only contact with Canada is that defendant's home office is there and the home office instructed the Cuban office as to the terms upon which the policies would be issued. They were issued, however, in Cuba. But for acts which occurred in Cuba, the notarial authentication of the policies necessary under Cuban law, the payment by the insureds of the first premium, and the agreements of the insureds to terms more onerous than they had requested, the policies never would have been issued and the contracts sued on here would never have come into being.

■ It is perfectly clear that under the law of Cuba defendant's obligation under these policies is to pay in pesos. Cuban law forbids defendant to pay in dollars. This has been true since 1951, long before Turull and Johansen left Cuba, as both Turull and Johansen were well aware. The 1951 Cuban law in effect changed the contract from a dollar contract to a peso contract. It changed it for both parties. Both Turull and Johansen paid their premiums in pesos after 1951, as they were required to do. Johansen indeed had paid them in pesos for some years prior to 1951, despite the policy provision.

It could be said that this case does not present a conflict of laws question because it does not involve a choice between conflicting legal rules. This seems to me to be the correct analysis. So viewed, the question is merely whether a New York court would give effect to the Cuban law which manifestly governs these contracts, or whether it would refuse to do so on grounds of New York public policy. In my opinion, it would give effect to the Cuban law.

Dougherty v. Equitable Life Assurance Society of the United States, *supra*, which involved actions in New York on insurance policies issued by defendant in Russia to Russian residents, indicates this result. Although there are factual differences between that case and this, as for example the fact that plaintiffs there were Russian nationals as well as Russian residents, most of these differences are not determinative. Indeed, in some respects the differences are in defendant's favor, for the Russian law which the New York court gave effect to in *Dougherty* was far more drastic than the Cuban law with which we are concerned. It amounted to an outright cancellation of the insurance contracts and the destruction of plaintiffs' rights thereunder.

It is true that the Russian policies in *Dougherty* expressly provided that they were to be governed by Russian law. There is no comparable provision in the policies here. It could be argued that it was because of ·this that the court in *Dougherty* held that New York public policy was not offended by the confiscatory Russian decrees.

No such factor was present, however, in French v. Banco Nacional de Cuba, *supra*, a more recent decision which is more closely in point. Plaintiff sued on a promise of defendant bank to pay him the dollar equivalent of pesos to be delivered by him to the bank. A Cuban decree of the Castro regime prohibited performance of this obligation. The New York Court of Appeals dismissed plaintiff's action to recover the dollars. It indicated that the Cuban decree did not contravene the public policy of New York. The court said (23 N.Y.2d at 55, 295 N.Y.S.2d at 442, 242 N.E.2d at 710):

> "A currency regulation which alters either the value or character of the ‚money to be paid in satisfaction of contracts is not a 'confiscation' or 'taking.' (Cf. Norman v. Baltimore & O. R. R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885; Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907, and Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 [Gold Clause Cases].)"

Moreover, the Court of Appeals went further to hold that under the "act of state" doctrine, considerations of New York public policy were irrelevant.

It may be granted that the Cuban currency decree in *French* was not precisely like the currency decree here. Any difference, however, would seem to make this an even stronger case for enforcement. It is hard to see how the 1951 Cuban decree, although of course it was a governmental act, amounted to an "act of state" within the rule of Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). It was not confiscatory. At the time it was enacted, the peso and the dollar for all practical purposes were at a parity. In substance, the 1951 law converted dollar obligations into peso obligations because it made the peso the only legal tender in Cuba. The peculiar situation which had previously existed under which Cuba had two different legal tender currencies, the peso and the dollar, ceased to exist. I see no reason why New York public policy should be offended by giving effect to this law as binding upon both plaintiffs and defendant with respect to Cuban contracts to be performed in Cuba. New York has enforced obligations incurred in foreign countries and valid there, as, for example, gambling contracts, which would seem much more likely to contravene the public policy of New York. Intercontinental Hotels Corp. v. Golden, 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964).

I conclude that the Cuban law applies and will be given effect. Under that law, defendant's obligation is to pay in pesos. Since it has never denied that obligation, it has not broken its contracts. Turull's beneficiaries may not recover the face amount of the policies in dollars and Johansen may not require defendant to accept premiums in dollars or to pay the face amount of his policy

in dollars to his beneficiary upon his death.

No claim is made in this action for the present dollar equivalent of the pesos which defendant admits it owes. If it were, the result would be no different, for the parties agree that at present the peso is worthless in terms of dollars. Plaintiffs cannot recover anything, therefore, even on this theory. Dougherty v. Equitable Life Assurance Society of the United States, *supra*.

As I stated at the outset, there have been decisions of other courts on this question, some of them in actions brought against this very defendant. Most of them have arisen in the courts, state or federal, in Florida. I have read all these cases, but I see no need to discuss them here. None of them is binding upon me because none purports to deal with New York law. The way that Florida views this question is not controlling in this court.

It may be noted, however, as a matter of interest, that Florida decisions may be found on both sides of the question. Confederation Life Association v. Ugalde, 164 So.2d 1 (Fla.Sup.Ct.1964), cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964), took the same view of the matter that I take. Several lower court decisions in Florida followed it. Then in Confederation Life Association v. Vega y Arminan, 207 So.2d 33 (D.C.App.Fla.1968), aff'd per curiam, 211 So.2d 169 (Sup.Ct.Fla.1968), cert. denied, 393 U.S. 980, 89 S.Ct. 450, 21 L. Ed.2d 441 (1968), the court distinguished *Ugalde* and reached a contrary result. The attempted distinction is hard to follow. The court seems to have been influenced primarily by the fact that the case before it was a suit in equity, whereas *Ugalde* had been an action at law.

This leads me to say a final word about the "equities" of the situation, irrelevant though they would appear to be. It is true that, due to fluctuations in foreign exchange which are not the fault of or within the control of either party, the pesos to which plaintiffs are entitled have no present value in dollars. This fact works a hardship on plaintiffs. It does not, however, in my opinion, lead to the conclusion, as the court in *Vega* seemed to think, that to deny recovery would result in unjust enrichment of defendant. After all, many of the premiums on these policies, almost all of them in Johansen's case, were paid in pesos. Moreover, defendant has accumulated reserves of pesos in Cuba to meet its obligation on these Cuban policies. Pesos are just as valueless to defendant in terms of dollars at the present time as they are to plaintiffs. To require defendant to use dollar funds in Canada or the United States to pay these policies, something that was never contemplated, leaving it with worthless reserves of pesos on its hands, would work a hardship on defendant. Defendant is a mutual company. All its policyholders everywhere benefit if it prospers and lose if it does not. To permit these plaintiffs to recover here could be said to be unfair to all the other policyholders of defendant who have not made such claims.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Defendant's motions upon which I reserved decision at the trial to strike certain testimony as irrelevant are granted.

The Clerk is directed to enter judgment in favor of defendant.

So ordered.