447 F.2d 175
 Harry T. JOHANSEN, Jr., individually and as Executor of the Last Will and Testament of Gladys Johansen, and Hortense Justiz de Turull, Plaintiffs-Appellants,
v.
CONFEDERATION LIFE ASSOCIATION, Defendant-Appellee.
 No. 464.
 Docket 35074.
 United States Court of Appeals, Second Circuit.
 Argued February 17, 1971.
 Decided June 17, 1971.
 
 David F. Dobbins, New York City (Royall, Koegel & Wells, and James M. Pape, New York City, on the brief), for appellants.
 Walter C. Lundgren, New York City (Lovejoy, Wasson, Lundgren & Ashton, and Douglas Foster, New York City, on the brief), for appellee.
 Before LUMBARD, SMITH and FEINBERG, Circuit Judges.
 LUMBARD, Chief Judge:
 
 
 1
 Plaintiffs appeal from a final judgment entered against them on May 7, 1970 in the Southern District of New York after trial before Judge McLean without a jury. The suit was brought initially in the Supreme Court of New York County, but was removed by the defendant insurance company to the federal district court on the ground of diversity of citizenship.
 
 
 2
 Plaintiffs' complaint has two counts. The first seeks recovery in United States dollars of amounts allegedly payable by defendant upon two $25,000 life insurance policies issued by it in 1937 and 1939 to Thomas Francis Turull y Belling who died in 1961. Turull's widow, Hortense Justiz de Turull, was the beneficiary of one of these policies. Turull's daughter, Gladys Turull Johansen, was the beneficiary of the other; and because she has since died, her executor claims the $25,000. The second count is asserted by Harry T. Johansen, Jr., the owner of an outstanding insurance policy issued in 1946; he seeks a declaration that the defendant is obligated to accept premium payments from him in United States dollars and to pay the proceeds of the policy upon his death in United States dollars. The life insurance contracts were made while Turull and Johansen lived in Cuba, and the company wants to pay the policies in Cuban pesos.
 
 
 3
 Judge McLean held that the defendant-company's obligation under these policies is governed by Cuban law and hence that it is to pay plaintiffs in pesos, rather than in United States dollars. Judge McLean's opinion is reported at 312 F. Supp. 1056 (S.D.N.Y.1970). The action is regarded by the parties, particularly by the defendant, as a test case, since defendant issued many similar policies in Cuba and this is the first case which has been fully tried on the merits. We affirm the district court's decision.
 
 I.
 
 4
 Defendant is a Canadian life insurance company with its head office in Toronto. It does business not only in Canada and in the United States, but also in twenty-two other countries including Cuba. Since 1909 it has had a branch office in Cuba; and from 1909 to 1959, when Castro took over, it issued policies to residents of Cuba. Its operations in that country have always been subject to Cuban laws and to the supervision of the Cuban government.
 
 
 5
 Turull, who was the insured of the two policies upon which plaintiffs now seek to recover, moved from his birthplace, Brooklyn, New York, to Cuba when he was a young man. He married a Cuban and had a substantial export-import business in Havana. In 1937 and 1939, he took out the two policies in question here with the defendant's Cuban office, his wife being the beneficiary of the first and his daughter the beneficiary of the second. He moved back to New York only after Castro came into power and died in New York in 1961.
 
 
 6
 Johansen, also a United States citizen born in New York, married Turull's daughter in New York in 1941 and thereafter went to work for his father-in-law in Cuba. In 1946, he took out a policy with defendant's Cuban office, and he remained in Cuba until Castro took over. Afterwards, he moved back to New York where he now resides. He seeks a declaration that defendant is obligated to accept premium payments from him in United States dollars, to make policy loans in United States dollars, and to pay proceeds upon his death in United States dollars.
 
 
 7
 Each of the three policies stated that "[a]ll sums payable or [receivable] under the policy shall be paid at * * * Havana, Republic of Cuba." Further, with respect to currency, each provided that "[a]ll sums payable or [receivable] under this policy shall be paid in lawful currency of the United States of America."
 
 
 8
 Although the latter provision might seem at first glance to solve the problem of this case, it does not do so because of the effect of the Cuban currency laws throughout the years. From 1914 to 1939, two currencies were legal tender in Cuba, the peso and the United States dollar. Theoretically they were of equal value and creditors could demand payment in whichever currency they chose. By 1939, however, the peso was actually worth less than the dollar. In an effort to bolster the peso, the Cuban government enacted a law in 1939 making the dollar and the peso interchangeable on a one-for-one basis. Each continued to be legal tender, but they could be used interchangeably, and debtors were now given the option as to which currency they wished to use in payment of their debts. Creditors were required to accept pesos in extinguishment of an obligation expressed in dollars and vice versa. Thus, it is evident that when the policies in question here stated that United States currency was to be paid, it was referring to a legal Cuban tender which after 1939 could be paid in either dollars or pesos.
 
 
 9
 In 1951, however, there was a significant change in the Cuban law. The new decree provided that henceforth pesos would be the only legal tender. United States dollars ceased to be legal tender and all obligations had to be expressed and paid in pesos. Obligations previously contracted in dollars had to be discharged in pesos at the rate of one peso for one dollar. Athough a person could still own dollars in Cuba, he could not use them to pay debts. Thus, this Cuban law in effect changed the insurance contracts in questions here from dollar contracts to peso contracts. The 1951 law was widely published in Cuba and defendant notified all its Cuban policyholders that all payments under policies which referred to United States currency would henceforth be payable in pesos. Neither Turull nor Johansen objected to this and both paid their premiums in pesos after 1951 as they were required to do. Indeed, even before 1951 Johansen had paid in pesos, although Turull had paid in dollars.
 
 
 10
 In 1959, when Castro took over, a new Cuban law made it a criminal offense to hold dollars and required owners of dollars to turn them in for pesos on a one-for-one basis. Since that time the peso has diminished in value in relation to dollars and today is substantially worthless in terms of dollars. This fact causes the dilemma of the instant case.
 
 
 11
 Although defendant is willing to pay plaintiffs the amounts due them in pesos and in Havana, plaintiffs seek payment of dollars in New York, because pesos are worthless to them here and they are forbidden by United States law to travel to Cuba. Defendant wants to pay in pesos because throughout the years it has invested the insurance proceeds from its Cuban policyholders in Cuban assets precisely in order to meet the obligations in pesos to those policyholders. Now, since it is forbidden by Cuban law to transfer those funds out of Cuba and since pesos are as worthless to it as to plaintiffs in terms of dollars, it has no present use for the funds which it invested in Cuba other than to pay off the Cuban policies. Hence, to require defendant to pay plaintiffs in New York dollars out of its general assets would leave it with worthless reserves of pesos on its hands.
 
 II.
 
 12
 The first question arising here is one of conflict of laws, i. e., whether the applicable law governing the disposition of this case is Cuban law, New York law, or Canadian law. On that question, both parties agree that in this diversity case, a federal court sitting in New York must apply the New York conflicts rules. Klaxon Co. v. Stentor Electrical Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). They disagree, however, as to what those rules are and as to what the result should be under them.
 
 
 13
 Judge McLean held that a New York court would apply Cuban law "both under traditional theories of conflicts exemplified by Dougherty v. Equitable Life Assurance Society of the United States, 266 N.Y. 71, 193 N.E. 897 (1934), and under the modern `center of gravity' or `grouping of contacts' theory of Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954)." 312 F.Supp. at 1063. To support this conclusion, he stated:
 
 
 14
 "The contracts were made in Cuba. According to their terms they were to be performed in Cuba. Substantially all the contacts are Cuban. Turull and Johansen were Cuban residents and domiciliaries. They paid their premiums in Cuba. The policies were enrolled on defendant's Cuban register. Defendant's reserves on these policies were maintained in Cuba. The policies were never transferred to New York, as they might have been if the insureds had requested it. * * * Neither Turull nor Johansen had any dealings with defendant in New York. Their dealings with defendant were in Cuba. Their late change of residence, in my opinion, is purely fortuitous and has no importance. * * But for acts which occurred in Cuba, the notarial authentication of the policies necessary under Cuban law, the payment by the insured of the first premium, and the agreements of the insureds to terms more onerous than they had requested, the policies never would have been issued and the contracts sued on here would never have come into being." 312 F.Supp. at 1063.
 
 
 15
 The defendant agrees, relying especially on the express provision that all payments were to be made in Havana.
 
 
 16
 Plaintiffs disagree. They argue that the theories relied on by Judge McLean, including the "grouping of contacts" approach, have been rejected or at least questioned by the New York courts. For this proposition, they rely on Miller v. Miller, 22 N.Y.2d 12, 15-16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 880 (1968), where the court stated: "the rule which has evolved clearly in our most recent decisions is that the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." See also Matter of Crichton, 20 N.Y.2d 124, 281 N.Y. S.2d 811, 228 N.E.2d 799 (1967); Intercontinental Planning v. Daystrom, 24 N. Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). According to plaintiffs, New York has a vital interest in determining whether or not its citizens who have fully performed insurance contracts in hard currency will receive hard currency back from the insurance company. On the other hand, they contend, Cuba has no legitimate interest in having its internal currency regulations applied to determine the outcome of this litigation.
 
 
 17
 Plaintiffs argue further that under this "greatest interest" rationale now used by New York courts, the present domicile of the parties seeking to recover is generally decisive. Indeed, in several cases, such domicile seems to have been crucial. See e. g. Miller v. Miller, supra; and Tooker v. Lopez, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969). Plaintiffs contend that since they are now domiciled in New York, New York's interest in ensuring that its domiciliaries receive fair performance on insurance contracts which they have performed is paramount and dictates that New York law should apply so that plaintiffs get paid in the currency bargained for — United States currency.
 
 
 18
 Moreover, looking to the question of the insureds' domicile at the time of the issuance of the policies, the plaintiffs again disagree with Judge McLean and contend that domicile is not synonymous with residence and that Turull and Johansen, while Cuban residents at the time the contracts were made, always remained domiciled in the United States. Plaintiffs cite cases holding that proof of change of domicile of origin must be clear and convincing. See Matter of Newcomb, 192 N.Y. 238, 84 N.E. 950 (1908); Matter of James, 221 N.Y. 242, 116 N.E. 1010 (1917); Perkins v. Guaranty Trust Co., 274 N.Y. 250, 8 N.E.2d 849 (1937). Here, according to plaintiffs, Turull and Johansen never intended to give up their citizenship, did intend to return to New York upon retirement, and hence remained New York domiciliaries.
 
 
 19
 Finally, plaintiffs argue, Canada also has an important interest in this case — that of having insurance companies domiciled there perform their contracts according to their express terms. In plaintiffs' view, the district court's decision here frustrates that policy. Plaintiffs' argument is supported by the Supreme Court of Canada's decision in Imperial Life Assurance Co. of Canada v. Casteleiro y Colmenares, [1967] Sup.Ct.Rep. 443, holding that a policy issued by a Canadian insurance company to a Cuban national who resided in Cuba prior to the advent of Castro was governed by Canadian law and hence was payable in dollars rather than in pesos. Thus, according to plaintiffs, if Canada's interest is important enough to have her law apply, the Imperial Life case indicates that defendant here must pay in dollars.
 
 
 20
 We disagree with plaintiffs' contentions. Their argument that under the "greatest interest" test the present domicile of the parties seeking to recover is crucial relies on cases which are inapposite to the instant case. The cases cited by plaintiffs in this regard were either wrongful death actions where New York domiciliaries were killed in out-of-state automobile accidents (e. g. Miller and Tooker) or actions involving property rights (e. g. Matter of Crichton and Perkins). This case, however, is an insurance contract matter; and if domicile is to be determinative in such a case, it seems more logical to look to the domicile of the insureds themselves at the time they entered into the contracts, rather than to the domicile of the plaintiffs at the time of bringing suit. For the rights and obligations of the parties under such contracts are determined by the law of the place where the insureds lived when the contracts were made and can hardly be changed solely because the insureds or the beneficiaries subsequently changed domiciles.
 
 
 21
 Looking to the more relevant question, then, we reject the plaintiffs' argument that Turull and Johansen always remained domiciled in New York. There was enough evidence here to support Judge McLean's conclusion that the insureds were Cuban domiciliaries at the time of the issuance of the policies. Both had permanent residences in Cuba with all or most of their business and property there. In Matter of Newcomb, 192 N.Y. 238, 250, 84 N.E. 950, 954 (1908), the court declared that "domicile means living in that locality with intent to make it a fixed and permanent home." It certainly appears that until Castro came into power, Turull and Johansen felt that Cuba was their permanent home, despite their United States citizenship. Indeed, in their applications for the policies, both stated that Cuba was their residence and answered "No" to the question whether they intended to "change domicile or take a journey." Such statements seem to us to constitute the "clear and convincing evidence" of their intent to be domiciled in Cuba.
 
 
 22
 In addition, the large number of contacts between the insurance contracts and Cuba cannot be ignored. See Babcock v. Jackson, 12 N.Y.2d 473, 481-482, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). Judge McLean found those contacts to be overwhelming and decisive. Moreover, Turull and Johansen did not object to the 1951 notice that payments on the policies would henceforth be made in pesos; and indeed until Castro, they were clearly willing to accept Cuban law as governing those policies.
 
 
 23
 Thus, we hold that under either the "grouping of contacts" test or the test propounded by plaintiffs, Cuban law governs the disposition of this case; and under Cuban law, defendant's obligation on these policies is to pay in pesos, since the 1951 Cuban law forbade defendant to pay in dollars and changed the contracts in question here from dollar contracts to peso contracts.
 
 III.
 
 24
 In any event, we feel that this case does not present a conflict-of-laws question because it does not involve a choice among conflicting legal rules. Judge McLean, too, felt that this was the correct analysis. According to him, the real question here is whether a New York court, even under New York law, would give extraterritorial effect to the Cuban law "which manifestly governs these contracts, or whether it would refuse to do so on grounds of New York public policy." 312 F.Supp. at 1063. Judge McLean found that a New York court would give extraterritorial effect to Cuban law, because to do so would not violate New York public policy. He relied for this conclusion on Dougherty v. Equitable Life Assurance Society of the United States, 266 N.Y. 71, 193 N.E. 897 (1934), and French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968), both of which involved the "act of state" doctrine.
 
 
 25
 Of course, the "act of state" doctrine does not apply to this case and hence would not require a New York court to give extraterritorial effect to the Cuban law. That doctrine prevents United States courts from sitting in judgment on acts or decrees of a foreign country dealing with property located within that country. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Thus, in Dougherty and French, a decision for the plaintiffs would of necessity have involved the nullification of a decree or regulation of a foreign government. Here, however, a decision for plaintiffs would in no way effect the integrity of any decree or regulation of the Cuban government, since the insurance company can pay in dollars out of its general assets and in New York without violating the 1951 Cuban currency law and without transferring funds out of Cuba in violation of the 1959 Cuban law. See Pan American Life Ins. Co. v. Blanco, 362 F.2d 167, 170 (5th Cir. 1966).
 
 
 26
 Plaintiffs argue that since the "act of state" doctrine does not apply, there is no reason to give the Cuban law effect in New York, when both New York and Canada have stronger interests in the outcome of this case than Cuba has. According to plaintiffs, the insurance contracts imposed upon the company a general obligation to pay plaintiffs when the insureds died. The policies, say plaintiffs, did not achieve an in rem status in Cuba, and hence the company has no right to convert its general obligation into a limited one to pay only from the assets which it had elected to invest in Cuba. This is especially true, plaintiffs contend, since the company failed to inform the insureds of the limitation which it now asserts. Thus, in plaintiffs' view, the defendant must pay its debts out of its general assets, not out of the limited reserves in Cuba.
 
 
 27
 We do not agree. As shown above, Cuban law governed these policies when they were made; that law in 1951 converted the currency of these policies to pesos; and until Castro, Turull and Johansen accepted the applicability of Cuban law and acquiesced in the shift in premiums from dollars to pesos. Neither objected to the 1951 change or to the contractual provision that all payments were to be made in Cuba until after Castro came into power — which in our view was too late. Thus, regardless of the fact that the "act of state" doctrine does not apply here, there is no reason or policy for a New York court not to give effect to the Cuban law, under which defendant's obligation is to pay in pesos. See Confederation Life Assoc. v. Ugalde, 164 So.2d 1 (Fla.Sup.Ct.) cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964).
 
 
 28
 Plaintiffs' final argument in this area is that a New York court should not give effect to the Cuban law because the company, as part of its sales pitch to prospective American-citizen insureds living in Cuba, including plaintiffs, represented that these policies, if taken out in United States dollars, would be honored by the company in the United States if the buyer returned there. Indeed, in a few instances prior to Castro, the company did transfer policies from Cuba to New York at the insured's request. Plaintiffs now ask us to require defendant to honor that representation here.
 
 
 29
 But estoppel cuts both ways in the circumstances in this case. Judge McLean dismissed plaintiffs' contention on the ground that in such instances where the company did transfer the policy to New York, the company also transferred to New York the reserve in Cuba covering its obligation on the policy, and now because of Castro no such transfer is possible since it is illegal in Cuba to transfer funds abroad. Plaintiffs respond to this by showing that no law, Cuban or otherwise, required that in a transfer of policies from Cuba to New York, the reserve covering the obligation also be transferred. It was merely the company's policy to do so; and according to plaintiffs, the fact that it cannot do so today does not negate its promise to pay in New York at the insured's request. Nevertheless, plaintiffs never requested that the policies be transferred to New York during the time when it was feasible for the company to do so. They did not make their request until after Castro took over, and they knew at that time that defendant could not transfer funds out of Cuba. It seems to us, then, that plaintiffs are now estopped from requiring that their request be fulfilled. Therefore, we conclude that defendant's alleged promise at the time of making these contracts is no reason for a New York court not to give extraterritorial effect to the Cuban law.
 
 IV.
 
 30
 Looking finally to the "equities" of the situation, they seem to us to tip the scale slightly in the defendant's favor. On the one hand, plaintiffs would have no use for pesos; and, according to them, they are entitled to payment on their policies in valuable currency since they paid their premiums in hard valuable currency. On the other hand, defendant accumulated reserves of pesos and invested in Cuba in order to meet its obligations on the Cuban policies, and those pesos are now worthless to it except to pay off the Cuban policies. Judge McLean found defendant's equities stronger, especially since defendant is a mutual company and all its policyholders may be affected if it must pay policies such as these in dollars. We agree.
 
 
 31
 Plaintiffs rely on the fact that the company was not compelled by any law to invest in Cuban assets in order to meet its obligations on the Cuban policies, but rather did so voluntarily and as part of its general policy; and they argue that therefore the company should now have to meet its obligations in currency valuable to plaintiffs. It seems to us, however, that the company's policy of investing in the country where the insured lived was a reasonable and almost necessary business decision, especially where, as here, the policy expressly provided for payment in that country. Thus, the company would not be unjustly enriched by being allowed to pay in pesos, whereas requiring it to pay in dollars would in effect be compelling it to pay twice and thereby put a burden on its general uncommitted reserves.
 
 
 32
 Affirmed.
 
 
 33
 J. JOSEPH SMITH, Circuit Judge (concurring in the result):
 
 
 34
 I concur in the result. When the assureds acquiesced in the change from U. S. currency to pesos and paid premiums in pesos they agreed to amendment of the policy terms as to the currency payable and are bound thereby. I am not at all convinced that Cuban law by itself accomplished this result, for payment in dollars elsewhere than in Cuba would not have been prohibited.
 
 FEINBERG, Circuit Judge (dissenting):
 
 35
 The basic issue in this case is whether the promise of an insurance company to an American citizen to pay death benefits "in lawful currency of the United States of America" should be enforced. The case would have been far different had the insurer's obligation been to pay benefits in "lawful currency" or in "legal tender" or in "lawful currency of Cuba." The first two phrases are capable of the construction defendant seeks, which the third embodies. But that is not what the policy said. The obligation instead was to pay benefits in "lawful currency of the United States." The majority concludes that this unmistakably clear promise of defendant insurance company is unenforceable even though that conclusion is inconsistent with the insurer's own selling practices and the insured's justified expectations and is contrary to the most relevant precedents. I emphatically dissent from such an inequitable and unjustified result.
 
 I.
 
 36
 The case involves three insurance policies issued by a Canadian insurance company through a local branch office in Cuba to two native born American citizens, Thomas Francis Turull Y Belling and Harry T. Johansen, Jr., while they resided in Cuba. Turull was born in Brooklyn, New York, in 1888 and moved to Cuba in 1911 where he founded a commission and merchant business selling United States chemicals and raw materials in that country. While in Cuba, he married a Cuban, who later became a naturalized citizen of the United States, and had three daughters. Due to the nature of his business, Turull was in constant contact with American business men and often traveled to the United States. In the 1930's, Turull began the practice, continued until 1959, of moving his family to New York for the summer months. For about 20 years, during the 1930's and 1940's, he maintained a New York apartment. While World War II was fought, Turull spent more time in New York than in Cuba. In 1959, Turull and his family left Cuba for New York, where he died in 1961.
 
 
 37
 Johansen's history is similar. He also was born and raised in Brooklyn, and went to work in New York. It was there that he first met the Turulls during the 1930's. After his marriage to Turull's daughter, he remained in New York until he entered the United States Air Force in 1942. He moved to Cuba in 1946, having been discharged that year, and began to work for his father-in-law. In addition to various business trips to New York State, he and his wife maintained an apartment on Long Island from 1952 to 1960 and regularly spent the summer months there. In 1960, Johansen left Cuba for the last time and has since lived in New York.
 
 
 38
 Defendant insurance company has an extensive world-wide organization and does business in some 22 countries, including the United States; its principal foreign business has been in the United Kingdom and in Latin America. The policies issued by defendant in Latin America differed somewhat from those issued in Canada, but there was a conscious effort to conform the clauses in the Latin American policies even when written in Spanish, to those in the Canadian policies. In the various countries where it did business, defendant normally maintained branch offices, which were not autonomous from the head office in Canada. It was at the head office that the decision "to go on the risk" was made and only there could changes in the terms of the policies be approved. As shown by the policies in this case, defendant's practice was to insert the capital city of the country in which the insured lived as the place of payment. However, defendant also had the general practice, which continued as to Cuban policies until 1959, of changing the place of payment to any new permanent residence of the insured. This practice was of particular interest, and a main selling point, for the European and North American business men in Latin America who may reasonably have expected to return to their home land.[1]
 
 
 39
 In 1909, defendant began selling policies in Cuba. From that year until 1939, it wrote there only policies calling for payment in United States currency. By 1939, approximately 30 per cent of its actuarial liabilities for policies delivered in Cuba were covered by investments in Cuba, all of which were in United States dollars. This practice of investing in Cuba exclusively in dollars continued well after the 1939 Cuban law made pesos and dollars interchangeable on a one-to-one basis. In 1945, defendant began to invest in Cuban mortgages. Even so, by 1951, much of defendant's Cuban investments remained dollar investments. After the 1951 decree, which ended the status of United States currency as legal tender in Cuba, defendant liquidated its dollar investments and converted them to pesos. As noted by the district court, 312 F.Supp. at 1058, however, defendant's investments in Cuba never equalled its actuarial liabilities there until 1960. At no time did Cuban law require that defendant's Cuban policies be paid out of assets held in Cuba. In addition, defendant's policies had no such limitation.
 
 
 40
 Turning from this background to the specific issues of this case, it will be convenient for analysis to focus on the two policies of $25,000 each that insured the life of Turull. These were issued to Turull in Cuba by defendant in 1937 and 1939. By the time of his death in 1961, Turull had paid in premiums well over the face value of each policy. His beneficiaries in those policies were his widow and his daughter; since the latter is now also deceased, her husband and executor, Johansen, sues in her place.[2]
 
 
 41
 At the time of Turull's death in New York, it is undisputed that his family — including the beneficiaries under the policies — were domiciled in New York along with him. The beneficiaries made a demand on defendant for death benefits to be paid in United States dollars in New York. Defendant refused and plaintiffs sued for breach of contract. The insurance company's defense, essentially, is that there has been no breach. It claims that Cuban law applies to the policies, that under the 1951 Cuban decree the insurer's only obligation is to pay Cuban pesos in Havana and that it is willing and able to do that. Such performance is totally worthless to plaintiffs. It is conceded that they, as United States citizens, can neither travel to Cuba nor handle currency there. Plaintiffs contend that the policies are governed by New York or Canadian law and that defendant is obliged to pay in United States dollars in New York. The district court agreed with defendant, reasoning that Cuban law "manifestly governs these contracts," that Cuban law converted the policies from dollars to pesos, and that New York would give effect to the Cuban law.
 
 II.
 
 42
 The underlying issue before us is whether the New York courts would, because of changes in the Cuban law after the policies were issued, excuse or limit the insurer's explicit promise to pay in American dollars. The parties seem in accord that in this diversity case we must first look to the conflicts law of New York, the forum state; the main opinion agrees, citing Klaxon Co. v. Stentor Electrical Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). I accept that assumption in this case.[3] While the main opinion ultimately applies Cuban law and answers the underlying issue in the affirmative, it recognizes that the New York courts would not reach that result because of the Act of State doctrine, French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968); Dougherty v. Equitable Life Assurance Society, 266 N.Y. 71, 193 N.E. 897 (1934), because that doctrine has no direct application in this case. The main opinion concludes that if defendant paid United States dollars in New York, it would not violate the Cuban law against either handling United States dollars in Cuba or transferring funds out of Cuba. I also believe that the Act of State doctrine has no application here, but base my conclusion on an additional ground. Act of State is a modification of the ordinary conflict rules.
 
 
 43
 If under accepted choice of law principles the foreign law should govern, the court could still refuse to apply that law if it were found to be contrary to the public policy of the forum. The act of state doctrine, however, says that the foreign "law" (i. e., the act of state) must govern certain transactions and that no public policy of the forum may stand in the way. [Footnote omitted.]
 
 
 44
 Henkin, Act of State Today: Recollections in Tranquility, 6 Colum.J. of Transnat'l L. 175, 178 (1967). Therefore, the act of state — here the Cuban 1951 decree — has no relevancy unless the New York courts would apply Cuban law. As will be seen below, I do not think that they would.
 
 
 45
 The main opinion reasons that the New York courts would rule that Cuban law applies and would give that law extra-territorial effect under either the "grouping of contacts" test, see Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954), or the "greatest interest" rationale, see Miller v. Miller, 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N.Ed.2d 877 (1968); Tooker v. Lopez, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969). It is true that ordinarily the rights created by a life insurance contract are determined by the local law of the jurisdiction (here Cuba) where the insured was domiciled at the time of application for the policy. See Restatement (Second) of Conflict of Laws § 192 (P.O.D.1969). But that rule is by no means ironclad, particularly in international cases. See Rossano v. Manufacturers' Life Insurance Co. [1963] 2 QB 352, and other cases cited in Restatement, supra, Reporter's Note § 192 at 10. When the insured changes his domicile after the policy is issued, as concededly occurred here in 1959, the jurisdiction to which he has moved has "the dominant interest in him."[4] Restatement, supra, Explanatory Notes § 192, comment d at 3. Moreover, in view of defendant's selling practices, described above, such a move was clearly foreseeable to it. Cf. Clay v. Sun Insurance Office, Ltd., 377 U.S. 179, 84 S.Ct. 1197 12 L.Ed.2d 229 (1964). These practices gave rise to a justified expectation by the insured that he could count on payment of benefits in American dollars when he went back to his domicile of origin where American dollars, rather than pesos, were used. Cf. South American Petroleum Corp. v. Colombian Petroleum Co., 177 Misc. 756, 31 N.Y.S.2d 771 (Sup.Ct.1941). When to these considerations is added the fact that the beneficiaries here are New York domiciliaries and that New York's choice of law would be influenced by its strong policy of construing insurance contracts to protect the insured, National Screen Service Corp. v. United Sattes Fidelity and Guaranty Co., 364 F.2d 275, 277 (2d Cir. 1966); Lumbermens Mutual Casualty Co. v. Pound Ridge, 362 F.2d 430, 432 (2d Cir. 1966), I do not think that New York would apply the Cuban law in this case and render worthless the benefits under the contracts.
 
 
 46
 Defendant argues that a New York court would look to the law of the place of payment as specified in the contract to decide in which currency payment of the obligation is to be made. That may correctly state a New York conflicts principle, but it only governs "details of performance and not * * * matters which substantially affect the nature and extent of the obligations imposed by the contract." See Restatement (Second) of Conflict of Laws, Explanatory Notes § 206, comment b at 319 (P.O.D.1968). In any event, application of that rule is doubtful where the contract itself makes provision, as do the policies in this case, for the type of currency to be used. Liebeskind v. Mexican Light & Power Co., 116 F.2d 971, 974 (2d Cir. 1941). Without deciding which law applies as to where performance is to be had, it seems reasonably clear that under New York or Cuban law the duty of defendant to pay benefits should not be narrowly construed as a duty to pay only in Havana. Defendant points to no Cuban law that limits the obligation to pay money under a contract to the place named in a place of payment clause. As the district court found, it would not be illegal under Cuban law for defendant to pay dollars in New York. 312 F.Supp. at 1056. The policies themselves contemplated that payment might be made elsewhere. Each stated that it was "exempted from restrictions in regard to residence, trips and occupation of the insured." And, to "obtain any of the benefits contained in the policy," one could "[w]rite directly to THE CONFEDERATION OF CANADA, or communicate with the authorized agent of the Association residing nearest to [the insured or beneficiary] whose duty [was] to facilitate any settlement without charge * * *." Prior to 1959, as recognized in the main opinion, defendant did make payments to beneficiaries who had moved outside of Cuba and allowed insureds to transfer their policies if they moved. This practical construction of the contract has great weight in determining the meaning that the parties gave to the contractual language and shows that the designated place of performance was not of great importance. It seems clear that the correct construction of this contract is that the place of payment clause was inserted into the policies as a matter of convenience and not as an essential part of the bargain. In light of this and the other conflicts considerations discussed in this opinion, I do not believe that under New York law the naming of Havana as the place of payment requires that Cuban law be applied to these policies.
 
 
 47
 There are only two jurisdictions, other than New York, with any arguable interest in the outcome of this case, Cuba and Canada. I agree that Cuba has numerous contacts with the transaction, but on analysis it is apparent that Cuba has no interest in the outcome of this case. Whether or not defendant has to pay plaintiffs, neither defendant's nor plaintiffs' assets in Cuba will be removed from that country. On the other hand, insurance is a highly regulated business and Canada has a strong interest in the practices of an insurance company domiciled there. Therefore, New York courts would be influenced by a recent ruling of the Canadian Supreme Court, Imperial Life Assurance Co. v. Casteleiro y Colemnares [1967] Can.S.Ct. 443, 62 D.L.R.2d 138, which refused to apply Cuban law in a situation not fairly distinguishable from this case.
 
 
 48
 In Imperial Life, defendant, a Canadian insurance company, had issued life insurance to plaintiff, a Cuban national. The policies were written in Spanish, were delivered in Cuba, and were payable in United States dollars. The Canadian court reasoned that a contract is governed by the law "with which it appears to have the closest and most substantial connection." 62 D.L.R.2d at 143. Finding that the decision to "go on the risk" was made at defendant's head office in Toronto, that the policies, although in Spanish, were a standard form that complied with the law of Ontario, that the place of contracting was Ontario, and that the insured would reasonably anticipate that the law of Ontario would govern the contracts, the court held that Ontario law applied to the policies. Accordingly, defendant was required to pay in Canadian currency the equivalent of the United States dollar value of the policies.
 
 
 49
 The decision below reaches a result, therefore, that defendant could not have obtained in its home jurisdiction of Canada. When the local law of the jurisdictions with the most interest in the insured, the beneficiaries, and the insurer would allow plaintiffs to recover, a New York court would not choose Cuban law. As between the law of Canada and that of the forum, there is no conflict and New York would apply its own local law.[5]
 
 
 50
 That defendant can no longer transfer its assets out of Cuba does not require affirmance of the district court order. Defendant's obligation to plaintiffs is a general one, payable from defendant's general assets. Defendant's unannounced policy of investing in Cuban assets enough funds to cover payment of its Cuban policies is irrelevant to its obligation to plaintiffs. On their face, there is no indication that the policies are restricted to assets held in Cuba. While perhaps it was a reasonable business practice to invest in Cuban assets, no Cuban law required defendant to do so. See Blanco v. Pan-American Life Insurance Co., 221 F.Supp. 219, 223 (S.D.Fla.1963), aff'd in part, rev'd in part, 362 F.2d 167 (5th Cir. 1966).
 
 
 51
 Nor can it accurately be said that the insured agreed to transposing the United States dollar policies into peso policies. Because there was no formal amendment of the policies as there might have been, see Blanco, supra, 362 F.2d at 168, 172, defendant relies on the fact that the insured paid his premiums in pesos after 1951. It is admitted that the insured did not object to the notice sent by defendant or ask that the policies be "transferred" out of Cuba. The notice, however, was not unambiguous. It stated:
 
 
 52
 All premiums payable in accordance with this policy as well as all other liabilities contracted under the same and in which a reference is made to American currency, will from now on be payable in Cuban National currency at par * * *.
 
 
 53
 The notice did not state that policies were payable only from defendant's reserves in Cuba or that they would not be payable in United States dollars some place other than Cuba. And defendant itself, by allowing payment in United States dollars in the United States after 1951, obviously did not believe that the 1951 change in Cuban law had such effect. Moreover, until 1959, Turull could not have transferred his policy to New York because defendant would not "transfer" insurance contracts off its Cuban registry if the insureds remained in Cuba. And since 1959, defendant has refused to transfer policies because it could not remove its assets from Cuba. Indeed, transferring policies after 1959 is what this case is about. Defendant should not be excused from performance because the insured failed to act in a way defendant would not have allowed.
 
 
 54
 Finally, a word on the equities. The district court regarded as inequitable the allocation to defendant of the loss resulting, in truth, from its decision to invest in Cuban pesos its net premium income from policies issued to American citizens who resided in Cuba. Apparently, this is so because defendant is a mutual insurance company. I fail to see how this makes great sense. It places the loss resulting directly from defendant's voluntary, if now proved to be unfortunate, decision to invest in Cuba on those who had no part in making, nor notice of, that decision and who can clearly less afford to bear it than defendant.
 
 
 55
 While my discussion has focussed on the two policies that insured the life of Turull, I believe that similar considerations apply to the policy that insures the life of Johansen. He seeks a declaration that defendant is obliged to accept premium payment dollars in New York and to pay death benefits in that currency. That Johansen cannot perform in Havana, Cuba, does not relieve defendant of its obligation. Accordingly, I would reverse the district court and direct defendant to pay in New York the death benefits on two of the policies in United States dollars and to accept United States dollars in New York as premium payments on the third.
 
 
 
 Notes:
 
 
 [1]
 The district court allowed testimony by defendant's former actuary on this issue, but it granted defendant's motion, apparently on the grounds of irrelevancy, 312 F.Supp. at 1065, to strike testimony as to defendant's selling practices in Cuba. The witness, a native-born New Yorker doing business in Cuba, had in 1933 taken out a policy with defendant while living in Cuba. He testified that defendant's agent had promised that if he returned to New York, a move he was contemplating at the time, the policy would be performed in New York. This testimony was relevant on the issue of defendant's selling practices and should not have been stricken
 
 
 [2]
 Johansen is the plaintiff on the third policy, issued by defendant in 1945, which insures his life. He seeks a declaration that defendant is obligated to accept premium payments from him in United States dollars and to pay the proceeds of the policy on his death in the same currency
 
 
 [3]
 But see Henkin, The Foreign Affairs Power of the Federal Courts: Sabbatino, 64 Colum.L.Rev. 805, 820-21 n. 51 (1964) (raising question of applicable conflicts rule when conflict is international rather than interstate)
 
 
 [4]
 The main opinion affirms the district court's finding that Turull and Johansen were domiciled in Cuba when the policies were issued. Under my analysis, resolution of the issue is not necessary. I note only that the district court may have equated domicile with residence, and, in any event, did not make the necessary specific finding regarding the insured's intention to change domicile of origin (New York) to domicile in a foreign country. See Perkins v. Guaranty Trust Co., 274 N.Y. 250, 8 N.E.2d 849 (1937); Dupuy v. Wurtz, 53 N.Y. 556 (1873). See also Restatement (Second) of Conflict of Laws §§ 15, 18 (P.O.D. 1967)
 
 
 [5]
 Application of New York law in this case is not prevented by the decision in Home Insurance Co. v. Dick, 281 U.S. 397 (1930). See Clay v. Sun Insurance Office, Ltd., 377 U.S. 179 (1964)